COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

Bryan J. HUMPHREY, Respondent.

No. 94–1848.

Supreme Court of Iowa.

Feb. 22, 1995.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Bryan J. Humphrey, pro se.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

The Committee on Professional Ethics and Conduct of the Iowa State Bar Association investigated lawyer Bryan J. Humphrey for the alleged neglect of three probate matters and a postconviction relief (PCR) matter. In the process, Humphrey allegedly failed to respond to (1) several orders from the state and federal courts on the PCR matter, and (2) numerous inquiries from the committee on all four matters.

The committee ultimately charged Humphrey with several violations of the Iowa Code of Professional Responsibility for Lawyers, all centering on the alleged neglect of legal matters entrusted to him and his alleged failure to cooperate with the committee's investigation of his handling of these legal matters.

The Grievance Commission recommended a suspension of Humphrey's license to practice law for thirty days. In our de novo review, we agree that suspension is appropriate but suspend Humphrey's license for a minimum of sixty days.

Humphrey has been licensed to practice law in Iowa since June of 1981. He is a sole practitioner in Fort Madison. He does mostly criminal, family, real estate, and personal injury work. Less than five percent of his work is devoted to probate matters. PCR

actions take between fifteen and twenty percent of his time.

Humphrey appeared pro se and testified before the commission. The record includes the complaint, the committee's request for admissions, numerous exhibits, and Humphrey's testimony. Humphrey did not respond to the committee's request for admissions, but admitted all allegations of the complaint at the commission hearing.

## I. The Probate Matters.

The probate matters involve the Michael P. Kenel estate, the Woodrow W. Brown estate, and the Rosa A. Segovia estate. Humphrey opened all three of these estates as attorney for each personal representative in 1989. The Lee County clerk of court sent Humphrey delinquency notices on each estate on May 1, 1993. The notices were for Humphrey's failure to file (1) tax clearances, (2) final reports, and (3) orders closing the estates. According to the notices, Humphrey had sixty days to cure the delinquencies. His failure to do so would result in the clerk reporting the delinquencies to the State Court Administrator and the committee.

These notices were followed by district court orders on May 5, May 21, and June 4, demanding that Humphrey appear and explain why these estates—and two others he was handling—were not closed. On June 4, Humphrey told the court that the Kenel, Brown, and Segovia estates would be closed within two weeks. Two weeks passed, and the estates remained open.

On July 1, the clerk reported the delinquencies to the committee. On August 24, the committee sent Humphrey an initial notice of complaint about the delinquencies in the three estates. Humphrey did not respond.

On September 21, the committee sent Humphrey a second notice of complaint about the three estates. Again, he failed to respond. The committee's administrator sent Humphrey another letter on October 11, requesting an immediate response. Humphrey did nothing.

On December 30, Humphrey did obtain an order closing the Kenel estate. He received additional orders granting him an additional sixty days to close the Brown and Segovia estates. He did not close either estate within the additional time allotted.

In early April 1994, Judge R. David Fahey talked with Humphrey by phone about the probate delinquencies. The judge told Humphrey that his continuing delay about closing the Brown and Segovia estates was a serious matter, and he gave Humphrey the names of three local lawyers who were available to assist him with any questions he had regarding the Segovia estate. Following this conversation, the judge entered orders in each estate on April 7, warning Humphrey that he could be found in contempt of court if both estates were not closed by April 27. A tentative show cause hearing was set for April 28. The estates were not closed.

On April 28 Humphrey appeared. Judge Fahey entered a show cause order in each estate giving Humphrey until May 6 to close the Brown estate and July 1 to close the Segovia estate. In the order Judge Fahey also barred Humphrey "from acting as counsel or filing any appearances in any probate matter in Iowa other than those he has already appeared in" until the Segovia and Brown estates were closed.

On May 3 the clerk again sent delinquency notices in the Brown and Segovia estates. The court's orders and these notices apparently spurred Humphrey to action. On May 6 Humphrey filed the inheritance tax clearance and final report in the Brown estate, and obtained an order closing that estate.

On July 1 the clerk reported the continuing delinquency in the Segovia estate to the committee. Later that month, the district court, Judge Fahey, found Humphrey in contempt of court in the Segovia estate. This estate was still open when the commission heard the present disciplinary matter.

At the hearing before the commission, Humphrey was asked why he had not responded to the delinquency notices in a timely manner. In the Kenel estate, Humphrey explained he failed to get the tax clearance within the sixty-day grace period in the notice. He said that was the main problem in the Brown estate also. As to the Segovia

estate, Humphrey said he had obtained clearance of the inheritance taxes, but did not explain why the matter was still pending.

The commission also asked Humphrey why he did not respond to repeated inquiries from the committee's counsel. Humphrey said he had no explanation and said that his failure to respond was "a stupid thing on my part." Humphrey also conceded there were local lawyers who could have helped him—including a brother in practice less than two blocks away.

## II. *The PCR Matter.*

On June 25, 1991, the district court appointed Humphrey to investigate a possible state court PCR action for Kurtis D. Strohbehn, an inmate at Fort Madison. The court ordered Humphrey to file a PCR action, if warranted, and if not, to report that to the court.

Several days later, Humphrey wrote Strohbehn, telling him that Humphrey would contact him immediately about his case. Humphrey failed to do so and did not pursue the matter.

Hearing nothing from Humphrey, Strohbehn filed a section 1983 civil action in federal court on August 8 covering the same subject matter as the proposed PCR action. Federal district court Judge Harold Vietor sent Humphrey two separate "Requests to Report" on February 18 and May 13, 1992. Each request asked Humphrey to provide the court with a report about his investigation of the viability of the state PCR action for Strohbehn. Humphrey responded to neither request.

Strohbehn amended his federal court complaint on May 26, 1993. Following this amendment, Judge Vietor ordered Strohbehn to report about the status of his state PCR action. Strohbehn responded with a handwritten report in which he told the judge that Humphrey was appointed to investigate a state PCR action on his behalf, but never did so.

Strohbehn filed a complaint against Humphrey with the committee about Humphrey's alleged failure to investigate the PCR matter. The committee sent Humphrey a notice of this complaint on August 19, asking him to respond within twenty days. Humphrey replied August 28, saying he would meet with Strohbehn on September 2 and get back to the Committee. He did neither.

The committee sent him a second notice on October 20. Again, Humphrey failed to respond.

The committee's administrator sent Humphrey a third letter on November 3. Humphrey did partially respond to this letter. In his response, Humphrey said that he had "considerable difficulty"—attributed only to himself—in making arrangements to visit Strohbehn about the state PCR action. Humphrey failed to address—as he was originally asked to do—whether he had responded to Judge Vietor's requests and whether he had any further communications with Strohbehn.

This prompted another letter from the committee's administrator, asking for answers to these two questions. Humphrey did not (1) answer this letter, (2) comply with Judge Vietor's orders, (3) file a PCR action for Strohbehn, nor (4) report to the state district court that, in his opinion, no such PCR action was warranted. In response to this evidence, Humphrey told the commission he had concluded that Strohbehn lacked standing to bring the state PCR action, but did not inform Strohbehn nor the state and federal courts of his conclusion.

Humphrey admitted that he received an inquiry from the committee about this matter on August 19, 1992. He admitted he did not meet with Strohbehn and did not follow up with the committee as he had promised in his August 28 reply letter.

After all the evidence was in, commission members asked Humphrey about the source of his difficulties. Humphrey revealed that at the time of the acts complained of, his marriage was falling apart. He denied any use of alcohol or drugs. He said that he had talked to his brother about a few things concerning the Segovia estate, but had not aligned himself with a mentor. He had not told his brother about the disciplinary proceeding against him.

When asked why he failed to respond to repeated inquiries from state and federal court judges and the committee, Humphrey said that he was depressed and did not want to take any more upon himself at that time. He did seek psychiatric counseling which he said had helped him.

■■■ Humphrey did not appeal the commission's recommended suspension. *See* Iowa Sup.Ct.R. 118.11. Nevertheless, we must review the record de novo. *See* Iowa Sup.Ct.R. 118.10. While we respectfully consider the recommendations of the commission, we are not bound by them. We impose the sanction we think most warranted by the facts in each individual case. *See id.* The committee must prove the ethical violations it alleged against Humphrey by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Zimmerman,* 465 N.W.2d 288, 290 (Iowa 1991).

■■■ A convincing preponderance of the evidence supports the commission's findings that Humphrey violated several disciplinary rules of the Iowa Code of Professional Responsibility for Lawyers. These include DR 1–102(A)(5) (conduct prejudicial to the administration of justice), DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice law), DR 6–101(A)(3) (neglect of legal matter entrusted to lawyer), DR 7–106(A) (lawyer shall not disregard ruling of tribunal), and DR 7–101(A)(1) (lawyer shall not intentionally fail to seek lawful objectives of client through reasonably available means). Humphrey freely admitted these violations. This brings us to the question of discipline.

### III. *Discipline.*

This is a classic example of the special difficulties a sole practitioner faces in stressful times. As the commission pointed out in its decision, Humphrey simply was not able to keep up during an extremely stressful time brought on by marital problems. Consequently, he felt overwhelmed. On the other hand, the commission quite properly noted that a mentoring relationship or peer support group with more experienced lawyers could have kept Humphrey out of trouble. Yet he chose not to ask for help although it was readily available—especially in the probate area.

The Iowa State Bar Association is presently engaged in a voluntary mentoring pilot project for law students and lawyers who have been in practice a short time. If successful, perhaps such a program could be expanded to help lawyers like Humphrey. We would then be in a position to consider probation with mentoring supervision as discipline instead of suspension, which we know is financially devastating and publicly humiliating to the affected lawyer.

Our reluctance in the past to order probation has been based upon the lack of an effective way to supervise a lawyer on probation. *See, e.g., Committee on Professional Ethics & Conduct v. Thomas,* 495 N.W.2d 684, 687 (Iowa 1993) ("Unlike the commission, we think supervision would be inappropriate here. For one thing, neither the court nor the bar has effective machinery for such supervision."); *Committee on Professional Ethics & Conduct v. Mahoney,* 402 N.W.2d 434, 435 (Iowa 1987) (lawyer was reprimanded and placed under supervision of his law partner; lawyer later withdrew from firm, former partner discontinued supervision, and lawyer again engaged in unethical conduct). An established and successful mentoring program under the auspices of the bar may well eliminate this concern.

Here the commission considered a public reprimand but chose the more serious sanction of a thirty-day suspension. It did so because it was not convinced that Humphrey understands the seriousness of his failure to respond to his clients, the state and federal courts and the ethics committee, and we are not confident that problems are all in the past. Because of Mr. Humphrey's failing to take steps to resolve matters even after the July, 1994 contempt finding we question whether he would respond to a reprimand alone by taking appropriate steps to avoid a recurrence.

For the reasons cited above, we conclude that a public reprimand would not be a sufficient sanction. At the same time, the panel was impressed by Mr. Humphrey's sincerity and by his admitting his wrongs. We particularly note that there was no

dishonesty, deception or misrepresentation involved in any of Mr. Humphrey's actions. We recommend that Mr. Humphrey be suspended for thirty days.

While we agree with this thoughtful analysis by the commission, we are not convinced that a thirty-day suspension is the appropriate discipline in this case, especially when Humphrey stonewalled two judges, as well as the committee. We think therefore that Humphrey should be suspended with no possibility of reinstatement for sixty days from the filing date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Sup.Ct.R. 118.12. Any application for reinstatement shall be governed by Iowa Supreme Court Rule 118.13.

In addition, we require that Humphrey, before applying for reinstatement, file a statement with our clerk of court certifying that (1) the Segovia estate has been closed, and (2) there are no pending probate delinquencies in any probate matter in which he is involved. The statement shall also include Humphrey's assurance that (1) he will not handle probate matters unless he associates with a lawyer experienced in that field, and (2) he will adopt, use, and maintain office practices that will aid him in performing future work in a timely manner.

Costs are assessed to Humphrey under Iowa Supreme Court Rule 118.22.

**LICENSE SUSPENDED.**

All justices concur except HARRIS and SNELL, JJ., who concur only in the result.