**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**John C. WAGNER, Respondent.**

**No. 99–623.**

Supreme Court of Iowa.

Sept. 9, 1999.

---

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for respondent.

Norman G. Bastemeyer, Charles L. Harrington, and David J. Grace, Des Moines, for complainant.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

This disciplinary proceeding is a textbook example of the pitfalls that await an attorney who decides to represent both the buyer and the seller in a large commercial transaction. The Iowa Supreme Court Board of Professional Ethics and Conduct

alleged that, in representing both the buyer and the seller, attorney John C. Wagner failed to make full disclosures to the buyer as required by our disciplinary rules. The Grievance Commission found that the board had established the violations alleged, and it recommended a three-month suspension. After carefully reviewing the record, we concur in the commission's findings and recommendation. We therefore suspend Wagner's license to practice law in this state indefinitely with no possibility of reinstatement for three months from the date of this opinion.

■ We review the record de novo. Ct. R. 118.10. Generally, the board has the burden to prove allegations of misconduct by a convincing preponderance of the evidence; this burden is greater than that required in civil cases, but less than that required in criminal cases. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans,* 537 N.W.2d 783, 784 (Iowa 1995).

■ However, when a respondent represents a client whose interests differ from those of another client, or from the respondent's own interests, the burden shifts to the respondent to prove that all the transactions were fair and equitable. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sikma,* 533 N.W.2d 532, 535 (Iowa 1995). Additionally, the respondent must prove that he or she

> faithfully discharged all [the respondent's] duties to the [respondent's] client, not only by refraining [from] any misrepresentation or concealment of any material fact, but by active diligence to see that [the respondent's] client was fully informed of the nature and effect of the transaction proposed and of [the client's] own rights and interests in the subject matter involved, and by seeing to it that [the respondent's] client either has independent advice in the matter or else receives from [the respondent] such advice as the latter would have been expected to give had the transaction

been one between [the respondent's] client and a stranger.

*Id.* at 535–36 (citation omitted).

## I. Facts.

Upon our de novo review, we find the following facts. Wagner has practiced law in this state since 1979. He has offices in Amana, Marengo, and Cedar Rapids. For a period of time, he served as a part-time judicial magistrate. Wagner devotes at least twenty-five percent of his practice to business and real estate matters and does some domestic and personal injury work.

Before April 1995, Carl Oehl and his family operated a restaurant known as Colony Market Place in South Amana. Titles to the business and the real estate upon which the restaurant was located were in the name of Colony Market Place, Inc., a corporation whose shareholders included Oehl and his family. The restaurant had been in existence for twenty-eight years and included a gift shop and a specialty food line.

In December 1993, Oehl closed all but the gift shop and specialty food line and decided to sell the business. He listed the property for six months with a Cedar Rapids Realtor, and his asking price was $475,-000. Oehl received no offers during the listing.

Oehl then listed the property with Great Western, a national organization dealing primarily with the sale of restaurants. Great Western had an appraisal firm, The Fisher Business Group, appraise the property. The Fisher Business Group appraised the property at $750,000. Oehl listed the property at this figure for eight months without success. He then dropped the price to $600,000, but he still had no success.

In February 1995, Oehl and Wagner agreed that, if Wagner found a buyer and would represent Oehl in the sale, Oehl would pay him a commission of ten percent of the gross sale price as compensation for all of Wagner's services. If the property

were sold on contract, Wagner was to receive ten percent of the down payment and ten percent of each payment on principal until the purchase price was paid in full.

Shortly thereafter, Wagner and his intern, Jeff Ritchie, visited the restaurant, viewed the appraisal, and reviewed the books and records of the business. Ritchie then prepared a sales brochure listing the asking price at $600,000. At one place in the brochure under the heading, Financial Information, appear the words "assurance of a profitable operation" and "a low risk factor for new ownership." Apparently, Oehl prepared this part of the brochure. Between March 16 and April 18, Ritchie contacted a number of people about buying the business but was unsuccessful in receiving any offers.

On April 18 David Childers met with Wagner at Wagner's Amana office to gather information about Oehl's restaurant. Childers knew that the restaurant had been closed for about fifteen months, but he did not know whether the restaurant was for sale. (At the time, Childers was a kitchen manager at another local restaurant.) Childers went to Wagner because Wagner had represented him in the past and Wagner was the only attorney he knew.

In that first meeting, Childers discussed buying the restaurant and starting his own business. He offered that he had never owned a business and had limited financial resources. Wagner told Childers that he represented Oehl in regard to the sale of Oehl's restaurant, but he could not be involved in negotiating a purchase price. Wagner also told Childers that it may be in his best interest to have independent counsel, but he did not explain why. And Wagner never mentioned he would receive a ten percent commission if he found a buyer for the restaurant. Additionally, Wagner mentioned that Childers could have his own appraisal but this would cost $1000 to $2000. Wagner, however, did not advise Childers that he ought to pay the money and obtain the appraisal. Wagner

charged Childers for this meeting and for all subsequent work he did for Childers.

The following day Childers signed a confidentiality agreement regarding any financial information he learned about Oehl's restaurant and received a copy of the sales brochure. Wagner and Ritchie then accompanied Childers to Oehl's restaurant to meet Oehl and view the restaurant.

On the same day, Wagner began making inquiries to a local bank about financing for Childers. Those efforts continued for several more days and resulted in the bank agreeing to finance a portion of the purchase price. Wagner prepared several documents the bank required as a condition for the loan. One of the documents was a subordination agreement for which he charged Childers one-half of the preparation time because the services benefited both Childers and Oehl. Apparently, the bank required the titleholder to subordinate its vendor's interest to the bank's loan to Childers.

Childers and Oehl agreed to a purchase price of $400,000 with a down payment of $150,000. Wagner prepared the offer to buy, which included these amounts. After Childers signed the offer on April 24, Wagner presented it to Oehl that evening. Oehl wanted some additional terms that Wagner included in a counteroffer. Childers accepted the counteroffer the next day. On the same day, Wagner and Oehl amended their fee agreement, reducing the total amount of compensation from $40,000 to $37,500 and providing that Wagner receive $30,000 immediately instead of $15,000 and the balance a year later.

Two days after the counteroffer was signed, Wagner sent a congratulatory letter to Oehl and Childers in which he stated:

I know I have repeatedly explained my legal ethics to all of you as this matter progressed, but I want to reiterate that I have represented all of you in the past. In regard to this transaction, it is my

opinion that I can continue to provide representation to the Oehl family and to the Childers family as long as you are fully informed of such representation, and as long as there are no controversies. This will also confirm that I took no part with either of you in the development of the purchase price amount or any negotiations relating thereto.

Wagner invited responses only if either party disagreed with these representations.

Wagner prepared the documents for closing, which included required real estate filings, a title opinion to Childers, the real estate contract between the parties, and closing statements for both parties. The closing took place on May 26. Oehl's closing statement disclosed Wagner's commission, but Childers' statement did not. Childers never received a copy of Oehl's closing statement.

In his title opinion to Childers, Wagner wrote:

Prospective purchasers are also advised that the title examiner also represents the seller on this transaction. Buyers are advised that such representation is a conflict of interest as the interest of the parties are different and likely adverse. Buyers are advised that it would be prudent for them to consult with other counsel concerning this opinion.

To complete the purchase, Childers borrowed the $150,000 down payment from the bank; $50,000 of this amount was secured by a mortgage on his home and $100,000 was secured by the business. Additionally, Childers borrowed $54,000 as working capital from his brother.

Childers took possession of the restaurant on May 26. The first contract payment of $9375 was due December 31. Childers only paid $6000 of that payment. Childers asked Wagner for help regarding his financial problems. In response, Wagner tried to convince the bank to renegotiate the loan but was unsuccessful.

On December 27 Wagner told Childers to retain other counsel. Wagner wrote Oehl a letter telling him the same thing. Childers and Oehl thereafter retained other counsel.

Eventually, Oehl forfeited Childers' contract. Childers, however, still owed the bank nearly $150,000. He also owed his brother the $54,000 he had borrowed from him. Additionally, Childers owed some outstanding restaurant bills.

Wagner found another buyer, a former client, Todd Markillie. Markillie bought the restaurant on contract, agreeing to pay $348,000 with $25,000 down on August 1, 1996. Wagner loaned Markillie $50,000 toward the purchase price. Markillie suffered the same fate as Childers had: Oehl forfeited the contract in January 1997. Wagner was only able to recover $9000 of the $50,000 Wagner had loaned Markillie.

Thereafter, Wagner and his wife purchased the restaurant on contract for $322,000 and a down payment of $2500 on February 21, 1997. Oehl gave Wagner a $6500 credit on the purchase price because of the partially unpaid commission owing on the sale to Childers. The Wagners are presently leasing the property to a couple who apparently are running the business successfully.

Meanwhile, Childers' new attorney learned of Wagner's fee arrangement with Oehl in May 1996. Childers sued Wagner, and the parties later settled. There is no record evidence of the grounds for the suit or the terms of the settlement.

## II. Ethical Violations.

The board charged and the commission found that Wagner violated Iowa Code of Professional Responsibility for Lawyers DR 5-101(A), DR 5-105(B), and DR 5-105(C). DR 5-101(A) provides:

Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may

be affected by the lawyer's own financial, business, property, or personal interests.

DR 5–105(B) requires a lawyer to

decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(D).

DR 5–105(C) prohibits a lawyer from

continu[ing] multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the representation of another, except to the extent permitted under DR 5–105(D).

In those situations covered by DR 5–105(B) and (C), the Iowa Code of Professional Responsibility allows a lawyer to

represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

DR 5–105(D).

## A. Differing interests.

 The principle underlying Ethical Canon 5 is that a lawyer should not represent parties with differing interests. The term "differing interests" is defined in subsection (1) under the definitional section of the Iowa Code of Professional Responsibility. It includes "every interest that will adversely affect either the judgment or loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." The differing interests need not be antagonistic. *In re Pappas,* 159 Ariz. 516, 523, 768 P.2d 1161, 1168 (1988). Furthermore, the mere possibility of an adverse effect upon the exercise of free judgment prevents a lawyer from representing clients with opposing interests.

*In re Gerde,* 634 N.E.2d 494, 497 (Ind. 1994).

 To establish a violation of Canon 5, the board need not prove the respondent acted with fraudulent or other improper motive. *See Committee on Prof'l Ethics & Conduct v. Mershon,* 316 N.W.2d 895, 899 (Iowa 1982). Nor does the board need to prove any client suffered economic harm. *See Committee on Prof'l Ethics & Conduct v. Postma,* 430 N.W.2d 387, 392 (Iowa 1988).

 Like the commission, we find that from Childers' initial meeting with Wagner, Wagner was representing both Oehl as a seller and Childers as a buyer. Wagner concedes this fact. Although we stop short of finding that Wagner had any role in negotiating the purchase price, we agree with the commission that this fact did not eliminate the conflict. In fact, Wagner recognized this conflict in his title opinion to Childers. As one commentator notes, the differing interests between buyer and seller are obvious, and price is only one of many areas in which those interests differ:

The process by which a buyer and seller of property transact their business is fraught with conflicts of interests. Indeed, a lawyer's simultaneous representation of a buyer and a seller in the same transaction is a paradigm of a conflict of interest. Beginning with such basic elements as determining the price and describing the property to be sold, what one party gets the other must concede. Terms of payment, security for unpaid balances, warranties of quality and of title, date of closing and risk of loss in the interim, tax consequences, and a host of other details should be addressed by each party or the party's adviser in a well-thought-out transaction. When the transaction is a large one—such as the purchase and sale of a residence, commercial property, or a business—the transaction typically becomes further complicated because the additional interests of banks, brokers,

tenants, and title insurance companies may intrude.

Charles Wolfram, *Modern Legal Ethics* § 8.5, at 434 (West 1986) (footnotes omitted) [hereinafter Wolfram].

We also find, as the commission did, that Wagner's own financial stake in the transaction—the ten percent commission—brought his interests into conflict with Childers' interest, a fact that Wagner concedes. Given the uncertainty of the value of the restaurant and the lack of offers from other interested parties, the purchase of the restaurant was a risky proposition. In these circumstances, Childers had a right to expect competent, disinterested advice that would allow him to make an informed decision on whether to proceed with the purchase at all. Wagner's own interest, on the other hand, was to make sure that the sale went through so he could earn his commission.

Wagner's interests conflicted with Childers' interests in two other respects. Childers' interest naturally called for achieving a rock bottom purchase price. In contrast, Wagner's interest called for achieving the highest price possible to maximize his commission. In addition, it was in Wagner's and Oehl's interest that Childers make a sizable down payment. Wagner's up-front commission payment depended upon the size of the down payment. Oehl's interest was what any contract seller would want: the higher the down payment the greater the security. Obviously, Childers' interest was to obtain as small a down payment as possible.

### B. Duty of full disclosure.

**1. Duty of full disclosure where attorney has financial interest in the transaction.** As mentioned, because of Wagner's ten percent commission, his interests conflicted with Childers' interests. In these circumstances, Wagner had the heavy burden of showing that Childers consented to Wagner representing him after Wagner made a full disclosure. *See*

DR 5–104(A). Under DR 5–104(A), a lawyer's duty to make full disclosure

> means more than making the client aware of the nature and the terms of the transaction. It also requires the attorney to give the client the kind of advice the client would have received if the transaction were with a stranger.

*Committee on Prof'l Ethics & Conduct v. Carty,* 515 N.W.2d 32, 35 (Iowa 1994) (citations omitted).

According to one writer,

> [t]he most obvious reason for requiring [a lawyer to disclose to a client their differing interests in a business transaction] is to permit a client to assess whether to do business and to continue to be represented despite the lawyer's conflicting self-interest. A less obvious, but nonetheless important, function of disclosure is that its absence serves as a strongly negative measure of the good faith of the lawyer. A lawyer who keeps his or her differing interests in a transaction secret from a client demonstrates a lack of candor that rightfully casts a pall of suspicion over the entire transaction.

Wolfram § 8.11.4, at 484; *see also Peaslee v. Pedco, Inc.,* 388 A.2d 103, 107 (Me.1978) (holding that clients were entitled to know that the lawyer had a personal stake in the transaction in deciding whether to consent to retaining him or his associate as their attorney). A failure to inform the client that the lawyer has a percentage interest in a transaction is a failure to make a full disclosure within the meaning of DR 5–104(A). *See, e.g., In re Pike,* 408 Mass. 740, 744-46, 563 N.E.2d 219, 222–23 (1990) (failing to disclose lawyer's 12.5% broker's commission in landlord-tenant transaction).

Additionally, in these circumstances,

> [l]awyers have a duty to explain carefully, clearly and cogently why independent legal advice is required. When a lawyer has a personal economic stake in a business deal, [the lawyer] must see to it that [the] client understands that [the

lawyer's] objectivity and [the lawyer's] ability to give [the] client [the lawyer's] undivided loyalty may be affected.

*In re Wolk*, 82 N.J. 326, 333, 413 A.2d 317, 321 (1980); *see also Sikma*, 533 N.W.2d at 537 (holding that lawyer has "a duty to disclose his adverse interests and the effect they would have on the exercise of his professional judgment"); *Committee on Prof'l Ethics & Conduct v. Oehler*, 350 N.W.2d 195, 199 (Iowa 1984) (holding that lawyer has a duty to fully disclose the lawyer's own rights and interests in a transaction). "Nor will a passing suggestion that the client consult a second attorney discharge the lawyer's duty when [the lawyer] and [the] client have differing interests." *In re Smyzer*, 108 N.J. 47, 55, 527 A.2d 857, 862 (1987). In like circumstances, we have held that the lawyer must *insist* that the client secure independent counsel and explain why the client would benefit from independent counsel. *See Carty*, 515 N.W.2d at 36.

██ There is no record evidence that Wagner ever disclosed to Childers his commission arrangement with Oehl. In fact, Wagner readily concedes he made no such disclosure.

As mentioned, Wagner suggested to Childers that it might be in his best interest to have independent counsel, but never explained why. Despite this oral admonition, we think Wagner actually encouraged both parties to proceed without independent counsel. In his letter to Childers and Oehl following Childers' acceptance of the counteroffer, Wagner wrote:

> In regard to this transaction, it is my opinion that I can continue to provide representation to the Oehl family and to the Childers family as long as you are fully informed of such representation, and as long as there are no controversies.

Like the commission, we conclude that Wagner failed to make a full disclosure of his financial interest in the transaction. Thus, any consent on the part of Childers to Wagner's representation was not an informed consent. Without such informed consent, Wagner's representation of Childers was in violation of DR 5–104(A).

**2. Duty of full disclosure in dual representation situations.** As mentioned, Wagner represented clients with differing interests. Thus, his duty to make full disclosure was again called into play. Absent such disclosures, Wagner could neither undertake representation of Childers, *see* DR 5–105(B) and (D), nor continue such representation once undertaken, *see* DR 5–105(C) and (D).

In a dual representation situation, it is not enough for a lawyer simply to inform the client that the lawyer is representing both sides. Full disclosure under DR 5–105(D) requires the

> attorney not only to inform the prospective client of the attorney's relationship with the seller, but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer obtain independent counsel.

*In re Dolan*, 76 N.J. 1, 10, 384 A.2d 1076, 1080 (1978); *see also In re Boivin*, 271 Or. 419, 425, 533 P.2d 171, 174 (1975) (holding it is not sufficient that attorney advise both parties that attorney is representing both of them; rather, attorney must explain to them the nature of the conflict of interest in detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each).

Such a disclosure is crucial in a large commercial transaction as the one here because as one court put it:

> A client cannot foresee and cannot be expected to foresee the great variety of potential areas of disagreement that may arise in a real estate transaction of this sort. The attorney is or should be familiar with at least the more common of these and they should be stated and laid before the client at some length and with considerable specificity.

*In re Lanza,* 65 N.J. 347, 352, 322 A.2d 445, 448 (1974).

A board opinion on multiple representation echoes these holdings:

> [A full disclosure] requires a detailed explanation to the client of all possible areas where the interest of one client may differ from that of the other. The burden is upon the lawyer to raise all possibilities. A simple recitation of the applicable law is inadequate. An explanation of the applicable law to every possible factual situation is essential.

Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct Formal Opinion, No. 79-19.

It is true that Wagner informed Childers and Oehl that he was representing both of them in the transaction and that if any controversies arose he would withdraw. In addition, Wagner told Childers about a possibility of a conflict. Wagner, however, did not advise Childers what possible conflicts might arise and why independent counsel was advisable. These disclosures to Childers were not adequate. *See In re Shannon,* 179 Ariz. 52, 62, 876 P.2d 548, 558 (1994) (holding that it was insufficient for attorney to merely inform client that there was a potential for conflict and if the conflict arose attorney would withdraw). Wagner did not shed his duty to point out the advantages of obtaining independent counsel even though he shied away from negotiating the purchase price. *See Lanza,* 65 N.J. at 352, 322 A.2d at 448 (holding that duty to disclose applies even though lawyer's representation of both parties did not include negotiating contract).

All of what we have said about Wagner's duty to insist that Childers secure independent counsel applies with equal force here. As we said earlier, whatever admonition Wagner gave about securing independent counsel was inadequate.

We adopt the following findings by the commission:

> [W]e find that Childers was harmed by not having had the opportunity for representation by truly independent counsel who could have been expected to personalize the lawyer-client relationship as the profession is normally practiced. Such representation would have been expected to have, inter alia, obtained greater knowledge of the potential purchaser's finances, discussed not only risk of loss but likelihood thereof for this type of business, and disclosed knowledge as to Oehl's preparation of "low risk investment" material and lack of any prior offers and minimum interest to that point in time by anyone else as [Wagner] was privileged to know.

We conclude Wagner violated DR 5-105(B), (C), and (D). On this point, we note that Wagner now "recognizes that he should not have attempted to undertake even a circumscribed and limited representation of both parties in the real estate transaction."

## III. Discipline.

■ Although Wagner did not appeal, he did file with this court a "statement in resistance to recommended sanction." He suggests as a minimum we impose a public reprimand and at most a public reprimand with a probationary order. He proposes that the probationary order be conditioned on his meeting "extraordinary continuing legal education requirements or do[ing] community service or provid[ing] a defined amount of civil case indigent representation."

The board responded, arguing in favor of the recommended three-month suspension. For reasons that follow we agree with the board.

Wagner points out that his misconduct resulted from errors of judgment and not moral turpitude and for this reason "any need for discipline in this case is symbolic rather than real." As the board responds, we have imposed suspension even in the absence of moral turpitude. *See, e.g., Sikma,* 533 N.W.2d at 538 (imposing three-month suspension for conflict of interest resulting from poor judgment).

Although Wagner's dual representation may have resulted from poor judgment, his failure to reveal his financial interest in the transaction struck at the heart of the attorney-client relationship:

> Every client has the right to expect that his attorney is ... not someone with a secret personal interest in the outcome of the client's case. Clients do not pay legal counsel for advice and representation which is or may be affected by counsel's own interests in the matter, and clients have a right to know not only whether an attorney has any interest in the subject matter of the representation, but also, if he has an interest, exactly what that interest is and how it may affect his judgment in their case.

*Office of Disciplinary Counsel v. Wittmaack*, 513 Pa. 609, 621, 522 A.2d 522, 528 (1987). Additionally, as we alluded to earlier, when Wagner kept his differing interests in the transaction secret from Childers, Wagner demonstrated a lack of good faith and candor.

Several aggravating factors militate in favor of the recommended sanction. One is harm to the client. *Committee on Prof'l Ethics & Conduct v. Baker*, 269 N.W.2d 463, 466 (Iowa 1978) (holding that economic harm aggravates conflict of interest violation). Had Childers known the true facts and received the independent legal advice he was entitled to, he might never have purchased the restaurant and suffered the financial loss that he did. Although this may be speculative, the fact remains that Wagner's dual representation and cover-up denied Childers the opportunity to make an informed choice. Although Childers may have recovered some of his economic loss in his civil suit against Wagner, this fact does not remove the need for a sanction. *See, e.g., Committee on Prof'l Ethics & Conduct v. Gardalen*, 414 N.W.2d 124, 129 (Iowa 1987) (holding that damage payment to client is not mitigating).

Another aggravating factor is Wagner's experience in the practice of law. *See, e.g.,* *People v. Bennett*, 810 P.2d 661, 666 (Colo. 1991) (holding that a lawyer's substantial experience in the practice of law is an aggravating factor). Sixteen years in the practice with a heavy emphasis in real estate transactions tell us that Wagner should have known better. His own title opinion to Childers showed that he was well aware that his dual representation was "a conflict of interest as the interest of the parties are different and likely adverse."

Wagner's prior reprimand for an advertising violation is a final aggravating factor even though the violation is not similar to the violations here. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mattson*, 558 N.W.2d 193, 195 (Iowa 1997) (holding that prior discipline for improper service of subpoena was an aggravating factor in disciplinary case involving trust account violations).

In recommending the three-month suspension, the commission took into consideration the good character and reputation evidence introduced in Wagner's behalf. So do we. See *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen*, 586 N.W.2d 383, 390 (Iowa 1998) (holding that good character evidence neither excuses nor reduces the seriousness of the unethical conduct but may be considered in determining an appropriate sanction).

We have not previously had the occasion to consider the appropriate sanction for a lawyer who represents both sides in a commercial transaction. Cases involving business transactions between lawyers and clients are analogous. In such cases, we have imposed sanctions ranging from public reprimand to revocation. *See, e.g., Carty*, 515 N.W.2d at 36 (reprimand); *Sikma*, 533 N.W.2d at 537–38 (three-month suspension); *Committee on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 36 (Iowa 1990) (revocation but violations included more than conflict of interest between lawyer and client). Of these three cases, *Sik-*

*ma* is the most analogous to this disciplinary proceeding.

The ultimate decision for the appropriate discipline is ours. *See Committee on Prof'l Ethics & Conduct v. Humphrey,* 529 N.W.2d 255, 258 (Iowa 1995). Nevertheless, we give respectful consideration to the commission's recommendation. *See id.*

In this case, the commission made exhaustive findings, gave a thorough review of appropriate authorities and their application to the facts, and came to a well-reasoned decision on a recommendation for appropriate discipline. We can find no fault with that recommendation. We therefore suspend Wagner's license to practice law in this state with no possibility of reinstatement for three months from the filing date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Ct. R. 118.12. Any application for reinstatement shall be governed by Court Rule 118.18.

Costs are assessed to Wagner under Court Rule 118.22.

**LICENSE SUSPENDED.**