# IN THE SUPREME COURT OF IOWA

No. 11–2062

Filed March 30, 2012

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

Complainant,

vs.

**BRYAN J. HUMPHREY,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends respondent's license be suspended. **LICENSE SUSPENDED.**

Charles L. Harrington and N. Tré Critelli, Des Moines, for complainant.

Bryan J. Humphrey, Fort Madison, pro se.

**MANSFIELD, Justice**.

An attorney was retained on a contingent fee basis to obtain a settlement from an insurance company. The attorney failed to put his agreement with his clients in writing. He subsequently allowed the matter to languish and did not respond to repeated inquiries from the clients. He also failed to respond to inquiries from the Iowa Supreme Court Attorney Disciplinary Board after the clients filed a complaint. We now have to decide whether the attorney violated our ethical rules and, if so, what the sanction should be.

This case comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10(1). The Board alleged the respondent, Bryan J. Humphrey, violated Iowa Rules of Professional Conduct 32:1.3, 32:1.4(a)(3), 32:1.4(a)(4), 32:1.5(c) and 32:8.1(b). The commission agreed and recommended Humphrey be suspended from the practice of law. Upon our consideration of the commission's findings of fact, conclusions of law, and recommendations, we also agree that Humphrey violated each of these rules. Considering Humphrey's current violations and his prior disciplinary record, we order his license suspended indefinitely with no possibility of reinstatement for three months.

## I. Factual and Procedural Background.[1]

Humphrey was admitted to the Iowa bar in 1981 and practices on his own. In July 2005, Humphrey was retained by Marty and Sheryl Victory to represent them in negotiating an insurance settlement with Amco Insurance Company. The Victorys' home had suffered fire damage

---

[1]The relevant facts are not in dispute. The allegations of the Board's complaint are deemed admitted because Humphrey's answer did not deny them. *See* Iowa Ct. R. 36.7. Furthermore, at the hearing, Humphrey acknowledged, "I do admit the allegations made against me."

following a lightning strike. Humphrey entered into an unwritten contingent fee agreement with the Victorys under which he would receive one third of their insurance recovery. On July 15, 2005, Humphrey sent a letter to Amco requesting that it cover the Victorys' hotel costs and out-of-pocket expenses. Humphrey continued to correspond regularly with the Amco adjuster through July 2008. The Victorys received an initial insurance payment of approximately $6000 from which Humphrey was paid one third.

However, beginning in October 2008, Humphrey essentially ceased responding to inquiries from the Victorys regarding the ongoing status of settlement discussions with Amco. From October 16, 2008, through December 30, 2009, the Victorys sent thirty-five text messages asking about the status of their claim. They received three text message responses from Humphrey on September 8, 2009, November 24, 2009, and December 2, 2009. The first of these responses came eleven months after the first query from the Victorys.

The Victorys also attempted to contact Humphrey through a series of certified letters. The first was sent on March 21, 2009, and stated:

> We have not had any luck getting a hold of you by phone so I thought I would try writing to you. We have a few questions we want answered.
>
> 1) Why don't you answer our calls or text messages?
> 2) When are you available to meet with us?
> 3) Are you still trying to get us settled?
> 4) What is the statute of limitation?
> 5) Have you filed a lawsuit against Allied? If so when?
> 6) Will you send copies of the lawsuit?
> 7) Have you tried to call Carl?
> 8) Have you sent a letter to Carl for him to sign?
>
> Please answer these and get back to us as soon as possible.

On April 19, 2009, and May 8, 2009, the Victorys sent two more certified letters asking Humphrey the same questions. Although Humphrey received all three letters, he did not reply to any of them.

On July 13, 2009, Humphrey wrote the Amco insurance adjuster about the Victorys' claim. On November 12, 2009, the Victorys sent a fourth certified letter stating:

> We have not heard from you in quite awhile. You do not answer our phone or text messages so I thought I would try writing to you. We have a few questions we want answered.
>
> 1) Why don't you answer our phone calls or text messages?
> 2) About a year ago you told us everything would be done by the end of the year, what happened?
> 3) Are you still working for us?
> 4) Have you been in contact with the insurance company at all?
> 5) Are you going to file a lawsuit against the insurance company for us?
> 6) If you are still working for us what is going on?
> 7) Have we said or done something to make you not want to help us?
>
> . . . .
>
> There are 202 days left before the 5 year anniversary of the fire.

Humphrey received this fourth letter on November 18 but still did not respond to the Victorys, although he did write the insurance adjuster again on their behalf on November 20, 2009.

Finally, on January 25, 2010, the Victorys mailed yet another letter which stated:

> We have not heard from you in quite a while. I wanted to enclose some of the many text that I (we) have sent to you with little response from you as you can see. We have sent registered letters to you with no response. The only time we get to talk to you anymore is when we run into you some where. When we hired you to help us, we believed in you and you continually let us down. Our number #1 question at this time is "Why?"

. . . .

There are 137 days left before the 5 year anniversary of the fire.

Humphrey did not respond to this fifth letter, so on March 17, 2010, the Victorys filed a complaint with the Board. Humphrey responded to the Board's initial inquiry, but did not reply to a subsequent July 15, 2010 letter asking him to "provide the Board with copies of [his] written communications with the insurance carrier, the complainants, and an accounting of all settlement checks received from the insurance carrier." He also did not reply to a second Board letter dated October 15, 2010.

The Victorys completed their negotiations with Amco on their own. On August 18, 2010, they agreed to a final settlement that involved an additional payment by Amco of $13,272.54. No portion of this insurance payment went to Humphrey. There is no evidence that the Victorys suffered any tangible financial loss because of Humphrey's actions or that Humphrey unreasonably profited from his work on their behalf. However, a substantial, multiyear delay occurred before the Victorys received their final insurance payment.

On August 5, 2011, the Board filed a complaint against Humphrey alleging that he had violated rules 32:1.3, 32:1.4(a)(3), 32:1.4(a)(4), 32:1.5(c) and 32:8.1(b). In his answer, Humphrey admitted he had violated rule 32:1.5(c) which requires that "[a] contingent fee agreement shall be in writing . . . ." He denied the other four alleged rule violations. Humphrey's answer did not respond at all to the thirty-six numbered paragraphs of factual allegations in the Board's complaint. Accordingly, the Board filed a motion asking that those alleged facts be deemed

admitted. Humphrey did not respond to this motion; an order was entered granting it on September 26, 2011.

The commission held a hearing on November 17, 2011. The Board offered three exhibits in evidence showing Humphrey's past disciplinary history: a public reprimand in 1995, a sixty-day license suspension in 1995, and a three-year license suspension in 1996. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Humphrey*, 551 N.W.2d 306 (Iowa 1996); *Comm'n on Prof'l Ethics & Conduct v. Humphrey*, 529 N.W.2d 255 (Iowa 1995).

Humphrey appeared pro se and offered no witnesses or exhibits but did testify on his own behalf. He admitted that his fee agreement with the Victorys was not in writing and that he had received a contingent fee out of the first $6000 insurance payment to them. Humphrey maintained that the Victorys had obtained other insurance payments through his efforts, from which he did not receive a share. Humphrey conceded he did not have anything to do with the Victorys' obtaining the final $13,272.54 payment.

Humphrey also admitted that "there were times I did not respond to my client." He said he had not responded to the Board's letters "from fear of being here, and I'm here now." He explained:

> I have no evidence to present. I do admit the allegations made against me. . . . I won't try to mitigate what happened by telling you the circumstances.

When asked, "Is there anything else in your life or in your practice that you feel would be a mitigating circumstance you would like us to take into account?" Humphrey answered, "Honestly, I wish there were, but there's not. . . . And no, I don't—I can't blame anything. . . . No, I don't have any excuses." When asked what in hindsight he would have

done differently, Humphrey stated he would have withdrawn from the case.

Following the hearing, the commission issued a report finding that Humphrey had violated rules 32:1.3, 32:1.4(a)(3), 32:1.4(a)(4), 32:1.5(c) and 32:8.1(b). The commission recommended a five-year suspension of Humphrey's license to practice law.

## II. Scope of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.10(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Fields,* 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission's findings and recommendations but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss,* 786 N.W.2d 860, 864 (Iowa 2010). "The board has the burden of proving attorney misconduct by a convincing preponderance of the evidence." *Id.* "This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett,* 674 N.W.2d 139, 142 (Iowa 2004). It is also a less stringent burden than clear and convincing evidence which is "the highest civil law standard of proof." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin,* 557 N.W.2d 515, 517 (Iowa 1996). If a violation is proven, we "may impose a lesser or greater sanction than recommended by the [grievance] commission." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Murphy,* 800 N.W.2d 37, 42 (Iowa 2011); Iowa Ct. R. 35.10(1).

## III. Review of Alleged Ethical Violations.

The Board alleged, and the commission found, that Humphrey violated five separate provisions of the Iowa Rules of Professional Conduct. Upon our review, we agree with those findings.

In the twenty-month period between July 2008 and the filing of the Victorys' complaint in March 2010, the only action Humphrey took to represent his clients was to send two letters to the claim adjuster. The first letter Humphrey sent was on July 13, 2009, nine months after the Victorys had sent Humphrey their first text message, four months after Humphrey received the first certified letter from them, and two months after he received the third certified letter. Humphrey did not dispatch his second letter to Amco until November 20, 2009, after he had received his fourth certified letter from the Victorys. These incomplete and severely delayed actions do not comply with the rule 32:1.3 standard requiring a lawyer to act with "reasonable diligence and promptness in representing a client." Iowa R. Prof'l Conduct 32:1.3; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, __ N.W.2d __, __, (Iowa 2012) (holding that an attorney's omissions and delays in handling an estate amounted to a "consistent failure" to perform the duties and responsibilities of an attorney and therefore violated rule 32:1.3).

Also, between October 2008 (when the Victorys began sending text messages to their attorney) and March 2010 (when they filed their complaint), Humphrey contacted his clients only three times, and each of these communications was by text. Although his lack of action on their behalf gave him little to report, he apparently did not even inform them about the two letters he had written to the adjuster. This lack of communication violated rule 32:1.4(a)(3), requiring an attorney to "keep the client reasonably informed about the status of the matter." Iowa R. Prof'l Conduct 32:1.4(a)(3); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cunningham*, __ N.W.2d __, __, (Iowa 2012) (finding a violation of rule 32:1.4(a)(3) when attorney failed to keep his client informed about the status of her divorce case).

In addition to being obligated to take the initiative to keep his clients informed, Humphrey was also required to follow rule 32:1.4(a)(4) by "promptly comply[ing] with reasonable requests for information." Iowa R. Prof'l Conduct 32:1.4(a)(4); *see also Lickiss*, 786 N.W.2d at 868 (finding an attorney in violation of rule 32:1.4(a)(4) for not keeping his probate clients informed and not responding to their attempts to reach him). The Victorys' informational requests were numerous, explicit, and reasonable, yet Humphrey ignored nearly all of them for at least seventeen months. Thus, he violated rule 32:1.4(a)(4) as well.

The commission also found that Humphrey did not respond to the Board's correspondence, thereby violating rule 32:8.1(b) requiring that a lawyer in connection with a disciplinary matter shall not "knowingly fail to respond to a lawful demand for information from a[] . . . disciplinary authority." Iowa R. Prof'l Conduct 32:8.1(b). We agree with this finding as well. It is undisputed that Humphrey disregarded the Board's July 15, 2010 letter asking him to provide "copies of your written communications with the insurance carrier, the complainants, and an accounting of all settlement checks received from the insurance carrier." He also failed to reply to a second Board letter sent three months later seeking the same discovery information. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo,* 799 N.W.2d 524, 534 (Iowa 2011) (finding a violation of rule 32:8.1(b) when an attorney failed to respond to the Board's discovery requests for documentation concerning his fee agreement and the scope of his representation).

Finally, as we have noted, Humphrey admitted he had entered into an unwritten contingent fee agreement with the Victorys providing that he would be paid one third of the insurance recovery. As Humphrey admitted, this action violated rule 32:1.5(c) requiring that "[a] contingent

fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined." Iowa R. Prof'l Conduct 32:1.5(c); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 598–99 (Iowa 2011) (finding that an attorney violated rule 32:1.5(c) by failing to execute a written contingent fee agreement with a client).

Based upon our de novo evaluation of the record we conclude the Board has shown by a convincing preponderance of the evidence that Humphrey has violated rules 32:1.3, 32:1.4(a)(3), 32:1.4(a)(4), 32:1.5(c) and 32:8.1(b).

### IV. Consideration of Appropriate Sanction.

Having determined that Humphrey violated these five rules as charged, we must now consider the appropriate sanction.

"We have repeatedly held that the goal of our ethical rules is to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Knopf,* 793 N.W.2d 525, 530 (Iowa 2011) (citation and internal quotation marks omitted). "Important considerations include the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and our duty to uphold the integrity of the profession in the eyes of the public." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fleming*, 602 N.W.2d 340, 342 (Iowa 1999). "In fashioning the appropriate sanction, we look to prior similar cases while remaining cognizant of their limited usefulness due to the variations in their facts." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wagner,* 768 N.W.2d 279, 288 (Iowa 2009) (citation and internal quotation marks omitted). "Often, the distinction between the punishment imposed depends upon the existence of multiple instances

of neglect, past disciplinary problems, and other companion violations, including uncooperativeness in the disciplinary investigation." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lesyshen,* 712 N.W.2d 101, 106 (Iowa 2006). Aggravating and mitigating circumstances are also important. *Knopf,* 793 N.W.2d at 531.

The core violation committed by Humphrey was the neglect of a single client matter.[2] Although neglect is not defined in our rules of professional conduct "it has generally been recognized to involve indifference and a consistent failure to perform those obligations that a lawyer has assumed, or a conscious disregard for the responsibilities a lawyer owes to a client." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman,* 683 N.W.2d 549, 551 (Iowa 2004). Neglect goes beyond ordinary negligence and "is a form of professional incompetence that often involves procrastination, such as a lawyer doing little or nothing to advance the interests of a client after agreeing to represent the client." *Id.* at 552.

Our past sanctions in cases where neglect was the principal violation have generally ranged from a public reprimand to a six-month suspension. *Id.* at 553. "We consider any harm to the client caused by the neglect in determining the proper sanction. Additionally, neglect compounded by misrepresentation will warrant a more severe sanction because of the critical importance of honesty in our profession." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas,* 794 N.W.2d 290, 294 (Iowa 2011) (internal citation omitted). We concur with the commission's recognition that "generally speaking, absent other serious concerns or aggravating factors, cases involving primarily neglect or communication

---

[2]We do not minimize, of course, the violation of rule 32:1.5(c).

issues have been viewed as less egregious than cases in which the actions of the attorney have involved deceit or dishonesty, or have caused financial harm to a client."

Where neglect is the primary violation, we have often chosen a public reprimand as the appropriate sanction. *See Van Ginkel*, __ N.W.2d at __; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 62 (Iowa 2009) (stating that "if the neglect evinced by Casey constituted his only misconduct, under the circumstances, we would be inclined to order a public reprimand"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Tompkins*, 733 N.W.2d 661, 670 (Iowa 2007) (ordering a public reprimand for an attorney who neglected two matters and failed to respond to the Board, where the attorney had a prior disciplinary record including a public reprimand for neglect and also citing other neglect cases where a public reprimand was imposed); *Dunahoo*, 730 N.W.2d at 205–07 (reprimanding an attorney for failing to account to a client and waiting four years to close an estate); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Parker*, 558 N.W.2d 183, 184–86 (Iowa 1997) (imposing a reprimand for delaying the closure of two estates for seven and eleven years respectively); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sather*, 534 N.W.2d 428, 429–31 (Iowa 1995) (reprimanding an attorney for failure to respond to the Board and neglecting an estate closure for eighteen years).

In *Van Ginkel*, we recently reviewed our prior neglect cases that involved additional violations or aggravating circumstances and therefore merited license suspensions of up to six months. ___ N.W.2d at ___. We categorized those cases as follows:

> In cases involving multiple instances of neglect, other additional violations, or a history of past disciplinary problems, however, the sanction has typically involved a

suspension for some length of time. In cases involving neglect in one or two cases and other misconduct such as misrepresentations associated with the neglect, the suspensions have been in the range of three months. *See* [*Iowa Supreme Ct. Att'y Disciplinary Bd. v.*] *Ackerman,* 786 N.W.2d at 497–98 (holding neglect in two estates, accompanying multiple misrepresentations, and early receipt of fee required a ninety-day suspension); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey,* 761 N.W.2d 53, 61–62 (Iowa 2009) (holding neglect in two cases, multiple misrepresentations, and the early collection of fee required a three-month suspension); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams,* 749 N.W.2d 666, 669–70 (Iowa 2008) (holding neglect in three cases, misrepresentation associated with neglect, failure to account to a client, and failure to respond to Board required a four-month suspension). In other cases where the pattern of misconduct has been more extensive, suspensions have typically been for a longer period of time. *See Wagner,* 768 N.W.2d at 288–89 (concluding neglect in multiple cases, improper withdrawal of fees in probate, failure to return unearned fees, misrepresentations to court and clients required a six-month suspension); [*Iowa Supreme Ct. Att'y Disciplinary Bd. v.*] *Humphrey,* 738 N.W.2d at 620–21 (holding neglect in six estates, with accompanying misrepresentations to court, and three instances of depositing unearned fees in business accounts required a six-month suspension).

*Id.* The neglect in *Van Ginkel* involved a single probate matter without financial harm to the estate, but the attorney had received two prior private admonitions, had collected fees prematurely, and most significantly had made a false statement to the tribunal, one of the most serious aggravating factors. *Id.* at __. For this combination of circumstances, Van Ginkel received a sixty-day suspension. *Id.* at __.

We also imposed a sixty-day suspension in *Thomas.* 794 N.W.2d at 295. Thomas had a history of discipline and admonitions including several probate delinquencies and a public reprimand for client neglect, and had frequently failed to cooperate fully with Board investigations in the past. *Id.* Thomas's inaction seriously harmed his client whose auto accident claim was dismissed because of his neglect. *Id.* at 292.

Thomas compounded this violation by deceiving his client about the status of the claim. *Id.* at 294.

In *Lickiss,* we suspended an attorney's license for a minimum of three months after he neglected four probate matters, failed to respond to clients' inquiries for information, took probate fees without prior court approval, and failed to notify his clients that he would no longer be representing them. 786 N.W.2d at 872. Lickiss had an important aggravating circumstance in that he had recently been publicly reprimanded for identical occurrences of neglect, although his voluntary remedial efforts constituted a mitigating circumstance. *Id.* at 869–71.

In *Iowa Supreme Court Attorney Disciplinary Board v. Cohrt,* we imposed a similar three-month suspension where the attorney had engaged in two separate instances of neglect, misrepresented to his clients the reason why their claim had been dismissed, had a prior private admonition for neglect, and also made misrepresentations to the Board. 784 N.W.2d 777, 783 (Iowa 2010).

Although suspensions for neglect generally do not exceed six months, *see Moorman*, 683 N.W. 2d at 553, longer suspensions of up to two years have been imposed for neglect in combination with much more serious violations or aggravating circumstances. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Joy*, 728 N.W.2d 806, 815–16 (Iowa 2007) (collecting cases); *see also Cunningham,* __ N.W.2d at __ (suspending license for eighteen months where two clients suffered significant financial harm due to neglect, and the attorney made multiple misrepresentations to both the clients and the court and never responded to the disciplinary proceedings against him); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carpenter*, 781 N.W.2d 263, 271 (Iowa 2010) (imposing a two-year suspension for an attorney's "misconduct in

seventeen client matters, including neglect, failure to communicate, and failure to safeguard his clients' interests upon termination of representation, in addition to his trust account violations and conviction of two traffic offenses"); *Joy*, 728 N.W.2d at 812–16 (Iowa 2007) (suspending an attorney's license for eighteen months where the attorney neglected four clients' matters, failed to comply with court orders, made several misrepresentations, failed to turn over client papers, and refused to cooperate with the Board's investigation); *Moorman*, 683 N.W.2d at 551–55 (imposing a two-year suspension where there were "numerous incidents of profuse and pervasive neglect," five clients were affected including one that was greatly harmed, there was absolutely no cooperation with the Board, the attorney offered to engage in fraudulent conduct and was described as the "worst violator of the time requirements of the rules of appellate practice in the state"); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins,* 613 N.W.2d 656, 657 (Iowa 2000) (suspending license for one year where an attorney had three previous reprimands for neglect, harmed clients financially, consistently ignored the Board's requests, failed to return client documents, and failed to return unearned fees).

Taken on their own, Humphrey's current violations might merit no more than a reprimand. Only one client has been affected, and the Victorys ultimately did not suffer financial harm because of the neglect, although they were forced to undergo a substantial delay before receiving their final insurance payment. *See Casey,* 761 N.W.2d at 61 ("An important consideration in determining the appropriate sanction is the harm caused by the neglect."). Humphrey did not profit from his actions (or inaction) and did not engage in deceit or misrepresentation to either his clients or the court. Also, although he did not respond to two letters

from the Board, he did answer the complaint, did testify at the committee hearing, and did ultimately admit to the violations he was charged with.

However, Humphrey's three earlier violations must be considered relevant aggravating factors. *See Van Ginkel*, __ N.W.2d at ___, ___ (holding that prior reprimands, though "somewhat dated," were an aggravating factor when the violations under consideration took place starting in 2007 while the admonitions had been issued in 1987 and 1994). In 1994, Humphrey was publicly reprimanded for failing to respond to inquiries from the Committee on Professional Ethics and Conduct. In 1995, we suspended Humphrey's license for sixty days after finding he had neglected three probate matters and a postconviction relief matter, and had "stonewalled two judges, as well as the [Committee on Professional Ethics and Conduct]." *See Humphrey*, 529 N.W.2d at 256–59. A year later, in 1996, we suspended Humphrey's license indefinitely with no possible reinstatement for three years. *See Humphrey*, 551 N.W.2d at 308–09. At that point, Humphrey not only had neglected several matters and been nonresponsive to courts, clients, and the Board, but also had misled a client about an error he had made and instructed another client not to inform the court of a fact that would have meant the court lacked jurisdiction. *Id.* at 307–08.

Although some time has lapsed from these violations, it is disheartening that Humphrey has resumed some of the habits that led to his difficulties and our imposition of severe sanctions in the 1990s. While the current violations do not involve fraud or dishonesty, and are limited to a single client matter, the earlier pattern of neglect and nonresponsiveness has reemerged. Therefore, despite the passage of time, and the somewhat narrower scope of the present violations as compared to those we addressed in 1995 and 1996, a substantial

suspension is appropriate to protect the public and uphold the integrity of the profession.

### V. Disposition.

Considering all the circumstances of this case, we suspend Humphrey's license to practice law in this state indefinitely with no possibility of reinstatement for three months. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.12(3). Humphrey must comply with rule 35.22 dealing with the notification of clients and counsel, and meet all the requirements of reinstatement provided in rule 35.13. The costs of this action are taxed to Humphrey pursuant to rule 35.26(1).

**LICENSE SUSPENDED.**