# IN THE SUPREME COURT OF IOWA

No. 12–0694

Filed February 8, 2013

**IOWA SUPREME COURT
ATTORNEY DISCIPLINARY BOARD,**

     Appellee,

vs.

**GEORGE QUALLEY IV** and
**THOMAS KARL BLEYHL,**

     Appellants.

---

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Attorneys appeal from the grievance commission recommendation that we suspend their licenses to practice law in Iowa for thirty days. **LICENSES SUSPENDED.**

Charles L. Harrington and Patrick W. O'Bryan, Des Moines, for complainant.

George Qualley IV and Thomas K. Bleyhl of Qualley & Bleyhl, P.L.C., pro se, for respondents.

**ZAGER, Justice**.

The complainant, the Iowa Supreme Court Attorney Disciplinary Board (Board), alleges the respondents, George Qualley IV and Thomas Bleyhl, violated numerous rules of the Iowa Rules of Professional Conduct. The alleged violations arose out of a sequence of events occurring from 2008–2010. The Grievance Commission of the Supreme Court of Iowa (commission) found Qualley and Bleyhl violated rules 32:1.4, 32:1.7, and 32:1.8. The commission recommended we suspend both Qualley and Bleyhl from the practice of law for thirty days. Upon our de novo review, we find both Qualley and Bleyhl violated our rules of professional conduct and suspend each of them from the practice of law for sixty days.

## I. Background Facts and Proceedings.

Qualley and Bleyhl were each admitted to the Iowa bar in 2006. They are the only partners in the law firm of Qualley & Bleyhl, P.L.C.

The Board filed a detailed complaint against both Qualley and Bleyhl on November 8, 2011, alleging that each of them, acting in concert with the other, had violated multiple ethical rules.

The commission held a hearing on February 27, 2012. On April 16, 2012, the commission issued its findings of fact and conclusions of law and recommended we suspend each of them from the practice of law for thirty days. The commission further recommended that the suspensions be staggered so as to minimize the disruption in the operation of their law firm. Qualley and Bleyhl appeal.

## II. Standard and Scope of Review.

We have adhered to the following standard of review for attorney disciplinary cases:

> "Attorney disciplinary proceedings are reviewed de novo. The Board bears the burden of proving misconduct by a convincing preponderance of the evidence, which is a lesser burden than proof beyond a reasonable doubt but a greater burden than is imposed in the usual civil case. If we determine the Board has met its burden and proven misconduct, 'we may impose a greater or lesser sanction than the sanction recommended by the commission.' "

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 876 (Iowa 2012) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 812 N.W.2d 4, 9 (Iowa 2012) (citations omitted)).

**III.  Findings of Fact.**

In September 2008, Broadmoor Place Homeowners Association (Broadmoor) retained Qualley and Bleyhl to assist it in collecting delinquent dues from a homeowner in Broadmoor. The homeowner had failed to pay monthly association dues and was in default in the amount of $4090. The parties entered into a contingency fee agreement for this debt collection. Qualley and Bleyhl performed a number of services in pursuing payment from the homeowner to Broadmoor. They began by sending a thirty-day notice to cure default as a prerequisite to initiating a foreclosure action. When the homeowner did not cure the default by paying the delinquent dues, Qualley and Bleyhl proceeded to file a foreclosure petition on behalf of Broadmoor.

While the foreclosure action was pending, the homeowner filed for bankruptcy. Qualley and Bleyhl represented Broadmoor in the bankruptcy action, filing a motion for relief from automatic stay in the bankruptcy court.[1] This motion was unresisted and subsequently

---

[1]While no formal agreement was ever executed between Qualley and Bleyhl and Broadmoor as to their representation in this bankruptcy action, or the subsequent CitiMortgage, Inc. foreclosure, it is not disputed that the parties assumed that their representation for these services would be on an hourly basis. Qualley and Bleyhl submitted periodic statements to Broadmoor for these services during this time that were timely paid.

granted. Broadmoor obtained a decree of foreclosure on October 23, 2009. In the decree, Broadmoor acknowledged a first mortgage existed on the subject property that was superior to their lien. During this time, and into 2010, Qualley and Bleyhl continued to take action to execute on Broadmoor's lien.

On September 11, 2009, the first mortgage holder, CitiMortgage, Inc., commenced an action to foreclose on its mortgage. Qualley and Bleyhl also represented Broadmoor's interest in this foreclosure action, ultimately consenting to a decree recognizing the secondary position of Broadmoor. A sheriff's sale was scheduled for August 12, 2010. While the record is unclear as to the reason for its action, CitiMortgage dismissed its foreclosure action without prejudice on August 5, 2010, one week before the sheriff's sale of the property

In the spring of 2010, Qualley and Bleyhl prepared the necessary documentation for the sheriff's sale. However, the decree they had obtained did not have an award of attorney fees. Similarly, none of the preliminary sale documents included accruing association dues. Broadmoor had expended $2696.59 in attorney fees to Qualley and Bleyhl in their handling of the two foreclosure actions and the bankruptcy. At least a portion of these attorney fees should have been included in the judgment against the homeowner and recouped in the sheriff's sale. Qualley and Bleyhl concede that the foreclosure decree "did not include the total amount [Broadmoor] was apparently entitled to." In testimony before the commission, Qualley was ambivalent as to whether he and Bleyhl had erred, stating it was "possible" Broadmoor would have gotten a higher judgment if he and Bleyhl had included attorney fees in the judgment amount, though he agreed Broadmoor was entitled to attorney fees. Qualley also offered no reasonable explanation

as to why accruing association dues were not included in the final judgment amount provided to the sheriff as part of the execution.

On July 27, 2010, in advance of the sheriff's sale, Bleyhl sent an email to Broadmoor's property manager. This email informed her that Broadmoor had the right to purchase the property at the sheriff's sale, but specifically recommended against exercising that right. This email also informed the property manager that Qualley and Bleyhl had found a "potential buyer," and further noted a "potential conflict of interest" since they would be representing both the buyer and the seller (Broadmoor). Neither Qualley nor Bleyhl advised Broadmoor who the potential buyer was or of the need to seek independent legal counsel. They also offered, "[W]e do not believe this poses a problem since we are trying to get the association completely paid off." Broadmoor's board elected to proceed despite the dual representation.

The weeks and months leading up to the sheriff's sale offer significant insight into the complaint filed against Qualley and Bleyhl. Qualley and Bleyhl have a longtime friend by the name of Izaah Knox. During the years prior to the events giving rise to this disciplinary action, the three of them had discussed investing in real estate with the idea of making money by "flipping" real estate in a short period of time.

Because of the assessed value of the subject property, Qualley and Bleyhl believed that they could buy the property cheaply, pay everyone off, and resell it quickly at a profit of $10,000 to $20,000. Qualley and Bleyhl approached Knox about buying the real estate at the sheriff's sale, and he agreed. To accomplish this, Qualley and Bleyhl organized Elite Real Estate, L.L.C. (Elite). Elite was recorded with the secretary of state on August 3, 2010. The initial capital of Elite was provided by Knox in the amount of $7000. Neither Qualley nor Bleyhl made any capital

contribution to Elite. Then, CitiMortgage dismissed its foreclosure action on August 5, 2010, one week before the sheriff's sale, which allowed Broadmoor to become the first bidder on the real estate subject only to the first lien holder. This fact was not communicated to Broadmoor, nor were the possible legal ramifications of the dismissal discussed with Broadmoor. However, in an email to Qualley and Bleyhl dated August 9, 2010, several days prior to the sale, Broadmoor did request confirmation that all association dues to date and legal fees would be included in the price listed in the sheriff's sale. The record does not show any response to this email prior to the sale.

A serious factual dispute in this matter concerns whether Qualley and Bleyhl advised Broadmoor's property manager of their relationship with Elite, the potential buyer who became the eventual buyer. Qualley and Bleyhl claim to have informed Broadmoor's property manager of their interest in Elite. However, the property manager testified she had not heard of Elite prior to the sheriff's sale. The president of Broadmoor's board also stated she knew nothing about Elite prior to the sheriff's sale. The record is also devoid of any record or document which would show this disclosure. Further, Broadmoor was not advised of the need to seek independent legal advice on the potential conflict.

On August 12, 2010, the sheriff's sale proceeded as scheduled. On behalf of Broadmoor, Qualley provided a written bid of $6500. Thereafter, either Qualley or Bleyhl made an oral bid of $6900 on behalf of Elite. As the high bidder, a sheriff's deed was issued to Elite that day. On September 2, 2010, Qualley and Bleyhl provided a check to Broadmoor in the amount of $6859.08 as its proceeds from the sale of the real estate in satisfaction of Broadmoor's judgment in the foreclosure action against the homeowner. Broadmoor was dissatisfied with the

proceeds received because the judgment did not include association dues that had accrued during the pendency of the action or the attorney fees expended in collecting these dues. After fruitless attempts to resolve the matter with Qualley and Bleyhl, Broadmoor's board president filed a complaint with the Board on behalf of Broadmoor.

## IV. Ethical Violations.

The Board alleged that Qualley and Bleyhl committed multiple violations of the Iowa Rules of Professional Conduct in their representation of Broadmoor and Elite.

**A. Conflict of Interest.** The Board alleged that Qualley and Bleyhl violated Iowa Rules of Professional Conduct 32:1.7 and 32:1.8.

Rule 32:1.7 provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

> (2) the representation is not prohibited by law;

> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

(c) In no event shall a lawyer represent both parties in dissolution of marriage proceedings

Iowa R. Prof'l Conduct 32:1.7. In pertinent part, rule 32:1.8 provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

. . . .

(i) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

(1) acquire a lien authorized by law to secure the lawyer's fee or expenses; and

(2) contract with a client for a reasonable contingent fee in a civil case.

. . . .

(k) While lawyers are associated in a firm, a prohibition in the foregoing paragraphs (a) through (i) that applies to any one of them shall apply to all of them.

*Id.* r. 32:1.8.

Qualley and Bleyhl represented both Broadmoor and Elite in a sale of real estate. In doing so, they owed a duty of loyalty not only to Broadmoor, but also to Knox, the third partner in Elite.

Qualley and Bleyhl do not dispute that they advised Broadmoor that it should not purchase the foreclosed property at the sheriff's sale. Nor do they dispute that they had a profit motive for creating Elite specifically to purchase the property. The commission found that

> the entire reason for [Qualley and Bleyhl] wanting to purchase the property was that they saw the possibility to make a profit by quickly reselling it. They would not have engaged Mr. Knox to form Elite if this was not true.

Upon our de novo review, we concur with the commission's factual findings.

We have held that it is axiomatic that representing both a buyer and a seller in the same transaction is a conflict of interest.

> [A] lawyer's simultaneous representation of a buyer and a seller in the same transaction is a paradigm of a conflict of interest. Beginning with such basic elements as determining the price and describing the property to be sold, what one party gets the other must concede.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 726–27 (Iowa 1999) (citation and internal quotation marks omitted). Qualley and Bleyhl disclosed to Broadmoor that they were representing both the buyer and the seller in this transaction. However, they failed to disclose the degree of conflict posed by this situation by not ensuring that Broadmoor's representative understood their personal interest in Elite. Additionally, they failed to advise Broadmoor to seek independent legal counsel. As summarized by the commission, Qualley and Bleyhl "acquired ownership of the property without providing written disclosures to either Elite or [Broadmoor], without telling them to seek advice of independent counsel and without getting informed consent in writing," violating Iowa Rules of Professional Conduct 32:1.8(a)(1), 32:1.8(a)(2), and 32:1.8(a)(3). Further, Qualley and Bleyhl "obtained a

proprietary interest in the subject matter of an in rem proceeding where they represented [Broadmoor]," which is prohibited under rule 32:1.8(i). *See* Iowa R. Prof'l Conduct 32:1.8(i).

Qualley and Bleyhl do not dispute that this was a conflict of interest or that they violated our ethical rules. Upon our de novo review, we concur with the commission's findings, undisputed by Qualley and Bleyhl. We find that Qualley and Bleyhl violated provisions of Iowa Rules of Professional Conduct 32:1.7 and 32:1.8 involving conflicts of interest.

**B. Communications to Client.** The commission found that Qualley and Bleyhl violated three distinct provisions of Iowa Rule of Professional Conduct 32:1.4 governing communication with clients.

"[W]hen [an attorney] represents a client whose interests differ from those of another client, or from the [attorney's] own interests, the burden shifts to the [attorney] to prove that all the transactions were fair and equitable." *Wagner*, 599 N.W.2d at 723. An essential part of this heightened standard is the requirement that the attorney must proactively ensure and be able to demonstrate that the "client was fully informed of the nature and effect of the transaction proposed and of [the client's] own rights and interests in the subject matter involved." *Id.* (citation and internal quotation marks omitted). The commission found neither Qualley nor Bleyhl fulfilled their responsibilities to communicate adequately with Broadmoor.

Rule 32:1.4(a)(1) requires a lawyer to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in rule 32.1.0(e), is required by these rules." Iowa R. Prof'l Conduct 32:1.4(a)(1). The rules define "informed consent" as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the

material risks of and reasonably available alternatives to the proposed course of conduct." *Id.* r. 32:1.0(e).

The commission found, and we concur, that neither Qualley nor Bleyhl fulfilled their responsibilities to provide informed consent to Broadmoor about the conflict they faced, as required by rules 32:1.7 and 32:1.8. As previously noted, Qualley and Bleyhl failed to communicate adequate information and explanation to either Elite or Broadmoor regarding the conflict of interest, constituting a violation of rule 32:1.4(a)(1) in addition to the violation of conflicts rules.

Iowa Rule of Professional Conduct 32:1.4(a)(2) requires that a lawyer shall "reasonably consult with the client about the means by which the client's objectives are accomplished." Rule 32:1.4(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The commission found, and we concur, that Qualley and Bleyhl violated these two interrelated provisions.

Qualley and Bleyhl did not properly inform *anyone* at Broadmoor, including the property manager, of CitiMortgage's dismissal of its foreclosure action. Qualley and Bleyhl also failed to discuss or communicate how the dismissal of this foreclosure action may have opened up additional legal avenues for Broadmoor, including a discussion as to whether it might now be beneficial for Broadmoor to bid on the property at the sheriff's sale. Broadmoor could not make an informed decision as to how to proceed without the benefit of all this information. Additionally, Qualley and Bleyhl failed to respond to a specific inquiry, prior to the sale, as to the full value of their bid at the sheriff's sale, which would have included the accruing homeowner dues and attorney fees. Per rule 32:1.4(b), Qualley and Bleyhl were required

to disclose this information. Per rule 32.1.4(a)(2), they were required to consult with Broadmoor as to how Broadmoor wanted to proceed. They did not do either of these things.

Further, as the potential buyer, Qualley and Bleyhl knew, but failed to inform Broadmoor, that Elite was only sufficiently capitalized to make the initial purchase at the sheriff's sale and had no provision for additional capital contributions to pay for the ongoing association dues to Broadmoor. Knowledge of these facts would have allowed Broadmoor the ability to make more informed decisions regarding its judgment. Now, Broadmoor is again dealing with a homeowner (Elite) that is delinquent in its dues. Finally, the commission found that Qualley and Bleyhl did not inform Broadmoor that the foreclosure judgment did not include ongoing association dues from the original homeowner to Broadmoor, nor did it include attorney fees. Qualley and Bleyhl did not disclose this material information to Broadmoor, nor did they consult with Broadmoor about how to use this information to fulfill Broadmoor's goals, again in violation of both rules 32:1.4(a)(2) and 32:1.4(b).

Broadmoor attempted to ensure it would be made whole in the sheriff's sale. In an email dated August 9, 2010—three days before the sheriff's sale took place on August 12, 2010—the property manager asked, "Does the sale price listed on the sheriff sale include all dues to date and legal fees?" Neither Qualley nor Bleyhl responded to this inquiry. Again, this communication issue constituted violations of both rule 32.1.4(a)(2) and 32:1.4(b). Qualley and Bleyhl did not provide this information, and without it, Broadmoor did not have the opportunity to make an informed decision about whether to move forward with the sheriff's sale or whether to make a bona fide attempt to purchase the property itself.

Even after repeated attempts to obtain a full disclosure and accounting of the judgment, accruing homeowner fees and attorney fees, Qualley and Bleyhl were not forthcoming. Instead, they refused to provide the accountings, responded in derogatory terms to the legitimate requests, and told Broadmoor that if it wanted a response, it would charge them for it on an hourly basis.

Qualley and Bleyhl repeatedly assert, both in their testimony in front of the commission and in their briefs, that they properly informed the property manager of all relevant matters and that it was the property manager who failed to provide this information to Broadmoor's board. Communication problems between the property manager and Broadmoor's board are irrelevant to our analysis. We agree with the commission's findings that Qualley and Bleyhl did not adequately convey important information to the property manager, or anyone else representing Broadmoor, in a timely manner.

Additionally, as the commission noted, Qualley and Bleyhl did not disclose other significant, relevant facts. They did not disclose the financial position of Elite, even though they were privy to that information. They did ultimately provide Broadmoor with all the pleadings and filings associated with the matter, including the foreclosure decree and the satisfaction of judgment, but this was not sufficiently timely to assist Broadmoor in achieving its goals. Qualley and Bleyhl argue that they had no incentive for violating our ethics rules with regard to appropriate communication, as Elite had not "made a dime," and they do not anticipate Elite will ever realize a profit from its investment here. Yet, both Qualley and the third partner in Elite, Izaah Knox, testified it was their intention to profit from flipping the unit. Knox, in fact, testified they anticipated making up to $20,000 on this

venture from their roughly $7000 investment. As Qualley testified, they recognized the purchase was a risk. The fact that they made a decision which ultimately turned out to be unprofitable does not mask the profit motive. Qualley and Bleyhl were nonetheless required to provide adequate information to Broadmoor.

We do not discipline for mere negligence or error in judgment. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Sobel*, 779 N.W.2d 782, 788–89 (Iowa 2010). In *Sobel,* we declined to find a violation when an attorney did not communicate with his clients through an interpreter, concluding that while the attorney's judgment of his clients' ability to understand English may have been incorrect, it did not reflect adversely on his fitness to practice law, especially as it reflected the understanding of multiple parties who had interacted with the attorney's clients. *Id.*

The actions of Qualley and Bleyhl represented more than mere negligence. They did not exercise sufficient diligence to ensure Broadmoor could make informed decisions regarding whether to bid at the sheriff's sale, the appropriate bid at the sheriff's sale, and whether Broadmoor would have wanted Elite as a buyer at the sheriff's sale. *See* Iowa R. Prof'l Conduct 32:1.4(b). Upon our de novo review, we agree with the findings of the commission that Qualley and Bleyhl violated rules 32:1.4(a)(1), (a)(2), and (b) governing client communication.

**C. Fee Agreement.** The Board alleged that Qualley and Bleyhl violated Iowa Rule of Professional Conduct 32:1.5(b), which governs fee agreements and requires that "the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

In evaluating possible violations of rule 32:1.5(b), we first determine whether there was a written agreement. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 533 (Iowa 2011). In the event no written agreement exists, we proceed to evaluate whether the attorney effectively communicated the fee agreement to the client. *Id.* The fee agreement Qualley and Bleyhl entered into with Broadmoor, while in writing, contemplated a standard contingency fee agreement for debt collection of unpaid association dues. When the representation evolved into legal services involving two foreclosure actions and a bankruptcy, the better practice would clearly have been to execute a new agreement on the basis of an hourly rate. Nevertheless, the property manager testified she understood the fee structure prior to the beginning of representation. Likewise, the invoices sent to Broadmoor reflected an hourly fee structure, and Broadmoor paid the invoices without expressing concerns regarding the fee structure. The commission found the Board did not prove a violation of rule 32:1.5(b), and we concur.

**D. Conduct of Dishonesty, Fraud, Deceit or Misrepresentation.** The commission characterized this as the "closest question presented," ultimately deciding that the Board did not prove by a convincing preponderance of the evidence that Qualley and Bleyhl violated rule 32:8.4(c) governing dishonesty, fraud, deceit or misrepresentation. We agree that this is an extremely close question, and Qualley and Bleyhl are aided by the heightened standard of proof the Board must meet. *See Weaver*, 812 N.W.2d at 9 (Iowa 2012) ("A convincing preponderance of the evidence . . . is a lesser burden than proof beyond a reasonable doubt but a greater burden than is imposed in the usual civil case."). Upon our de novo review, we agree that the Board failed to meet its burden in establishing a violation of rule 32:8.4(c).

In the past, we have found violations of rule 32:8.4(c) in situations in which attorneys have made false statements to the security commission, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kersenbrock*, 821 N.W.2d 415, 421 (Iowa 2012), forged documents, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Newman*, 748 N.W.2d 786, 787–88 (Iowa 2008), and altered documents, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schall*, 814 N.W.2d 210, 213–14 (Iowa 2012).  However, we require a reasonable level of scienter to find an attorney violated rule 32:8.4(c).  *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 587 (Iowa 2011) ("In the legal sense, a misrepresentation usually requires something more than negligence." (Citation and internal quotation marks omitted.)).

The commission found that Qualley and Bleyhl advised Broadmoor not to purchase the property, even though their own actions demonstrated they thought it would be profitable to do so.  Qualley and Bleyhl also failed to respond in a timely manner to Broadmoor's inquiry, prior to the sheriff's sale, as to whether the foreclosure judgment included the entire amount to which Broadmoor was entitled.  Instead, Qualley and Bleyhl referred to a phantom "second sale" as a possibility for curing any issues with the first sale, which never materialized.

Many of the problems in this area originated after the sale was complete.  Though we do not hold Qualley and Bleyhl accountable for the property manager's failure to notify Broadmoor's board of the ownership interest Qualley and Bleyhl disclosed immediately subsequent to the sheriff's sale, their interactions with Broadmoor's board and the new property manager after the sale are problematic.  Rather than respond in a timely manner to requests for information in a way that assisted Broadmoor in understanding the law and the proceedings, both Qualley and Bleyhl stonewalled.  Qualley informed the new property manager

that he was "poorly informed with respect to how a foreclosure for homeowner's association dues actually works." When the new property manager continued to press for an accounting of invoices and an explanation regarding the conflict of interest issues, Bleyhl told him that Broadmoor was lucky to have gotten anything and "[h]ad we [Qualley and Bleyhl] not pursued this action, the dues owed would have been discharged in bankruptcy and the association would be totally out of luck."

Even more disturbing, Qualley and Bleyhl failed to provide billing records and the accounting for funds that the new property manager requested. Representing that they had provided all of the requested information to the previous manager, they informed the new manager that they would charge their standard hourly rate for providing the requested information.

However, the commission also recognized that some of the inaccurate statements Qualley made to his clients might have been due to inexperience. In support of this conclusion, it cited Qualley's testimony at the disciplinary hearing. "[I]t was clear that Mr. Qualley did not understand the concept of amending the judgment." As the commission noted, negligence does not violate this rule. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011) (finding a level of scienter greater than negligence is required to find a violation of rule 32:8.4(c)).

Ultimately, the commission found credible the contention of Qualley and Bleyhl that they intended to help Broadmoor, while simultaneously helping themselves. Though Broadmoor's board president indicated that Broadmoor had no interest in purchasing the unit, and Broadmoor's financial ability to do so was questionable, that

does not relieve Qualley and Bleyhl of the responsibility of representing Broadmoor's interest and informing them of the possible advantages of purchasing the unit. To their credit, as owners in Elite, Qualley and Bleyhl did bid a sufficient amount to cover Broadmoor's initial judgment and court costs. We do not believe they intended to cheat Broadmoor. They simply did an incompetent job of fully protecting Broadmoor's interests. We do not believe this rises to the level of dishonesty, fraud, deceit, or misrepresentation required to prove a violation of rule 32:8.4(c).

## V. Sanctions.

There is no standard sanction warranted by any particular type of misconduct. *Weaver*, 812 N.W.2d at 13. Though prior cases can be instructive, the sanction warranted in a particular case must be based on the circumstances of that case. *Id.*

> In determining the appropriate discipline, we consider the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the respondent's fitness to continue in the practice of law, as well as any aggravating and mitigating circumstances. The form and extent of the sanctions must be tailored to the specific facts and circumstances of each individual case. Significant distinguishing factors in the imposition of punishment center on the existence of multiple instances of neglect, past disciplinary problems, and other companion violations.

*Id.* (citation and internal quotation marks omitted).

Qualley and Bleyhl repeatedly emphasize their belief that they have "learned their lesson" and will not reoffend. While individual deterrence is one factor we consider, we must also consider all of the other factors enumerated above. We have responsibilities to both the public and the bar to discourage violations of our rules of professional conduct.

Qualley and Bleyhl clearly did not effectively communicate the status of their representation to Broadmoor, in violation of our rules. Additionally, Qualley and Bleyhl were involved in a direct conflict of interest, failed to fully disclose the conflict of interest, and never obtained, in writing, informed consent to the conflict as required by our rules. They did not adequately inform either of their clients, Broadmoor or Elite, of the facts the clients needed in order to give informed consent to Qualley and Bleyhl's representation.

We have imposed a public reprimand and suspensions of varying duration for similar conduct. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ta-Yu Yang*, 821 N.W.2d 425, 427 (Iowa 2012) (holding public reprimand was warranted for attorney who violated rule of professional conduct prohibiting attorney from engaging in conduct involving misrepresentation, rule requiring attorney to explain matter to extent reasonably necessary to permit client to make informed decisions, and rule governing conflict of interest); *Netti*, 797 N.W.2d at 600, 607 (imposing a two-year suspension where attorney engaged in a conflict of interest with his client, among other violations); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Zenor*, 707 N.W.2d 176, 182, 187 (Iowa 2005) (imposing a four-month suspension where attorney represented opposing entities, among other violations); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 378, 381–82 (Iowa 2005) (imposing a four-month suspension where attorney represented opposing entities, among other violations); *Wagner*, 599 N.W.2d at 723 (imposing a three-month suspension where attorney failed to inform the client of the attorney's financial interest in a transaction); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sikma*, 533 N.W.2d 532, 537–38 (Iowa 1995) (imposing a three-month suspension on attorney who engaged in undisclosed

business transactions with a client). We have also imposed public reprimands for similar behavior. *Comm. on Prof'l Ethics & Conduct v. Qualley,* 487 N.W.2d 327, 328, 330–31 (Iowa 1992) (imposing a public reprimand where attorney and his client engaged in a transaction together intended to profit both attorney and client, but attorney did not provide complete disclosure of his interests).

We also consider any aggravating and mitigating factors. We consider cooperation with the Board's investigation to be a mitigating factor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Axt,* 791 N.W.2d 98, 103 (Iowa 2010). Qualley and Bleyhl cooperated with the Board's investigation. Additionally, the record does not disclose any prior disciplinary action involving either of the respondents, which is also a mitigating factor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moonen,* 706 N.W.2d 391, 402 (Iowa 2005).

Multiple violations of our ethical rules warrant increased disciplinary sanctions. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lesyshen,* 585 N.W.2d 281, 288 (Iowa 1998). We have found Qualley and Bleyhl violated multiple provisions of the rules.

Qualley and Bleyhl engaged in a course of conduct that violated multiple rules of professional conduct in an attempt to gain personal profit. Their testimony that they did not actually accrue personal profit does not erase their intention of profiting. Additionally, the fact that they have lost money on the transaction has resulted in financial harm to both Elite and Broadmoor, the two entities they represented. Elite was not properly capitalized to hold the property for an extended period of time. As a result, it now stands to lose its investment to either the first mortgage holder or to Broadmoor, as Elite is in arrears on its association dues and the status of the first mortgage is unknown. Unfortunately,

Broadmoor again has a homeowner who is neglecting to pay the dues owed to Broadmoor.

Considering the aggravating and mitigating factors, and the need to protect both the public and the bar against the type of self-dealing that occurred here, we find suspension is warranted. We conclude that the appropriate sanctions in this case are suspensions of both Qualley's and Bleyhl's licenses to practice law for sixty days.

## VI. Disposition.

For the above reasons, we suspend the licenses of George Qualley IV and Thomas Bleyhl to practice law in this state for sixty days. The suspension of George Qualley IV shall commence on the filing date of this opinion. The suspension of Thomas Bleyhl shall commence on April 12, 2013. The suspension applies to all facets of the practice of law. Iowa Ct. R. 35.13(3). Qualley and Bleyhl must comply with the notification requirements of rule 35.23, and costs are taxed against them pursuant to rule 35.27(1). Unless the Board objects, Qualley's and Bleyhl's licenses will be automatically reinstated on the day after the sixty-day suspension period expires if all costs have been paid. Iowa Ct. R. 35.13(2).

**LICENSES SUSPENDED.**