# IN THE SUPREME COURT OF IOWA

No. 16–1228

Filed January 27, 2017

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**BRUCE A. WILLEY,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent committed ethical misconduct and recommends a thirty-day suspension. **LICENSE SUSPENDED.**

Tara M. van Brederode and Amanda K. Robinson, Des Moines, for complainant.

Leon F. Spies of Mellon & Spies, Iowa City, for respondent.

**ZAGER, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board (Board) filed a complaint charging an attorney with violations of four of our ethical rules based on his representation of two clients in a business transaction. The Board and the attorney entered into a joint stipulation of facts and rule violations, and the Grievance Commission of the Supreme Court of Iowa (commission) found the attorney violated three ethical rules. The commission recommended a thirty-day suspension. Upon our de novo review, we conclude the Board proved by a convincing preponderance of the evidence violations of Iowa Rules of Professional Conduct 32:1.7(a)(2) (concurrent conflict of interest) and 32:1.7(b)(4) (informed consent). We impose a sixty-day suspension for the rule violations.

## I. Background Facts and Proceedings.

Attorney Bruce A. Willey practices law at Willey O'Brien, L.C. in Linn County, Iowa. Willey was licensed to practice law in Iowa during the time of the conduct that gave rise to this disciplinary action. Willey is also a Certified Public Accountant (CPA).

David A. Wild (Wild) has been a client and business partner of Willey since at least 2006. In December 2006, Willey incorporated Synergy: Projects, Inc. (Synergy) on Wild's behalf. At the time of incorporation, Wild was the president of Synergy and Willey was the original registered agent. Willey continued to serve in this capacity until April 2015. While the precise legal and business relationships between Wild and Willey are unclear from the record, by February 2007, conflicts of interests were apparent such that Wild and Willey executed a detailed consent and waiver form for the conflicts. The first paragraph of the form provides:

> I, David Wild, am President of and otherwise involved with several corporations, including but not limited to, Evergreen Timber Corp., Global Resources, Inc., and Synergy: Projects, Inc. as well as member and manager of other Limited Liability Companies, related entities and subsidiaries (collectively "Wild Group"), do hereby acknowledge that I have been fully informed of the potential conflicts inherent in the representation of me and my company by Bruce A. Willey, Bruce A. Willey, P.C., Willey O'Brien, L.C. and its successors and assigns (collectively "Willey").

Willey began providing legal services to Henry J. Wieniewitz, III (Wieniewitz) in 2008. Willey provided legal advice on corporate business structure and tax structure for companies owned by Wieniewitz. Willey also prepared income tax returns for Wieniewitz and advised him regarding companies he was exploring for purchase.

In June 2010, Willey and Wieniewitz met to discuss a business that Wieniewitz was considering purchasing. During this meeting, Willey learned that Wieniewitz was interested in possible investment opportunities. After discussing the original business purchase, Willey told Wieniewitz that he knew of another investment opportunity that might be available and he would let him know if there was space for an additional investor.

In July, Willey contacted Wieniewitz and told him that he could participate in the investment opportunity if he acted quickly. Willey told Wieniewitz that other clients of his had been involved with the same or similar investment opportunities and that it was a safe and common investment. Specifically, Willey emailed Wieniewitz, "[There] isn't really risk related to that . . . ." Willey informed Wieniewitz that the minimum investment was $100,000. Wieniewitz decided to invest $100,000. Prior to forwarding the check to Willey, Wieniewitz told Willey, "I can afford to be out the liquidity 30–60 days, but could never afford to put the money in a place to potentially lose it." Wieniewitz denies that Willey ever

advised him prior to his investment that he was investing money with another client.

The investment opportunity was structured as a loan between Wieniewitz and Synergy. Wieniewitz wrote a check for $100,000 payable to Willey's law firm. Willey prepared a promissory note on behalf of Synergy that reflected the agreement between Synergy and Henry and Amber Wieniewitz. Pursuant to the terms of the promissory note, this original investment would be repaid within forty-five days. Thereafter, Wieniewitz would receive $100,000 every forty-five days until the total amount paid to him equaled $400,000. The promissory note did not provide any security or collateral to Wieniewitz in exchange for the loan.

Willey deposited the check into his trust account and immediately disbursed the money to Synergy. Willey did not bill any party for drafting the promissory note. However, Wild considered Willey to be acting on behalf of Synergy. In his personal statement to the Board, Willey stated that he believed he was acting only as an intermediary who was facilitating a business relationship between two sophisticated business people.

Willey did not disclose his relationship with Wild or Synergy to Wieniewitz until much later. Willey never obtained informed consent from Wieniewitz, nor confirmed in writing any potential conflict of interest with Wild and Synergy. Willey did not recommend Wieniewitz consult with independent counsel regarding the concurrent conflict of interest.

At the outset of the transaction, Willey offered Wieniewitz the opportunity to meet with Wild to discuss the loan; however, Wieniewitz declined the offer. All communication regarding the loan and efforts to collect on the loan was made through Willey. Although Willey facilitated

the loan and all of the communication between the parties, he had no independent information about the transaction other than what Wild told him. At the time Willey prepared the promissory note between Synergy and Wieniewitz, he had no knowledge of how Synergy would utilize the funds from Wieniewitz or the identities of the other parties or entities with whom Synergy was working. Willey had no direct financial interest in Synergy.

After the initial $100,000 investment, no payments were received as promised. Wieniewitz contacted Willey on multiple occasions to request information about the status of the loan repayment. Wieniewitz began emailing Willey in September 2010 expressing concern about the transaction. On September 20, Willey emailed Wieniewitz to update him that Wild had informed him of a "short delay" in disbursements. In an email on September 27, Wieniewitz wrote that he had expected to have his principal returned by then, as per the promissory note. He told Willey that his wife believed the entire transaction was a scam. Willey responded that he did not believe it was a scam, but Wild had been tied up with a family emergency and that may explain the delay. Later, Willey responded that he had spoken with Wild and Wild told him there was no problem with the transaction, but that the parties were "negotiating a few items behind the scenes and that [was] the reason for the delays."

In October 2010, Wieniewitz again emailed Willey to ask about the status of the disbursements. Willey emailed him an update from Wild: "They are expecting funds to arrive at Singapore account tonight our time. The time has been used up getting through the system by trading bank, settlement bank and disbursement bank. Will be speaking again this coming night (US)." On November 18, Willey emailed Wieniewitz to

tell him that Wild expected to have the funds that week, but was "[j]ust clearing up last of [the] paperwork necessary to allow release."

In February 2011, Wieniewitz emailed Willey asking about the payments because he wanted to use the loaned funds to purchase some apartments. Willey responded that "some things have been going on behind the scenes and neither [Wild] nor [he] wanted to give out information before its time." Willey again included a response from Wild that said the "funds are sold, just behind schedule."

Wieniewitz emailed Willey again in March asking about the payments and was again forwarded a response from Wild:

> The representation of platform manager is as follows:
>
> All will be finished in the next 4 days regarding trade platform issues and should have no more problems.
>
> [T]heir intent is to have liquidity available (overseas) this coming week. Thank you for your patience.

Wieniewitz did not receive any payment and followed up with an email to Willey on May 6. Willey responded,

> Dave [Wild] reports that everything is moving well now, he is trying to pinpoint when funds will be available in US and expects update in 48 hours or so. He says there is good progress, shouldn't be much longer, this will get done.

When no payments were received, Wieniewitz sent another email to Willey on September 18 asking for a realistic timeline on the return of his money. Wieniewitz also expressed frustration at repeatedly being told things were "close" but never receiving a disbursement. Willey responded and again told Wieniewitz the funds would be disbursed "in the next couple of weeks."

On January 19, 2012—a year and a half after his original investment—Wieniewitz sent Willey a letter and an email demanding the

money he invested be returned to him by January 23. Willey responded via email,

> I don't know that it works that way, though I understand your position and feelings. The ability to return the funds would be different if the principal were sitting in a bank account. It has been deployed and has not yet come back. I would be happy to arrange a call with Dave to discuss the situation and to obtain the most up to date information. I would be happy to visit with you and Amber as well. There has been some positive progress of late and it has been represented that things will clear up soon. We are just as frustrated as you are. Let me know if you would like to arrange a call with Dave so we can schedule.

Wieniewitz contacted another attorney about the transaction and his options for the return of his money.

Wieniewitz's new counsel contacted Willey about the return of the money. Willey responded that he could not provide specifics about the transaction because the materials regarding the transaction were protected under a nondisclosure agreement. After multiple emails were exchanged, Willey continued to state that the funds were expected the next week. When no funds were received, Wieniewitz filed a complaint with the Board on April 16, 2012.

The Board filed its complaint against Willey on September 30, 2015. In the complaint, the Board alleged violations of rules 32:1.7(a)(2) (concurrent conflict of interest), 32:1.7(b)(4) (informed consent), 32:1.8(b) (using client information), and 32:1.9(c) (duties to former clients). A hearing was set for April 28, 2016. On April 25, the Board and Willey entered into a joint stipulation of facts and rule violations. Based on the joint stipulation, the Board and Willey agreed to waive a hearing and submitted the case to the commission based on the pleadings, stipulation, and briefs.

The commission filed its findings of fact, conclusions of law, and recommendation on July 18. Based on the stipulation, the commission found Willey violated rules 32:1.7(a)(2), 1.7(b)(4), and 1.8(b). However, it found there was not a sufficient factual basis to find a violation of rule 32:1.9(c). The commission met again to consider the parties' briefs addressing the appropriate sanction for the rule violations. The commission considered mitigating and aggravating factors and recommended a thirty-day suspension. Willey filed a timely notice of appeal.

**II. Standard of Review.**

Our review of attorney disciplinary proceedings is de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 207 (Iowa 2016). "The Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id.* (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 217 (Iowa 2015)). While we give the findings and recommendations of the commission respectful consideration, we are not bound by them. *Id.* If we find the Board proved attorney misconduct by a convincing preponderance of the evidence, we may choose to impose a sanction that is lesser or greater than the sanction recommended by the commission. *Id.*

**III. Analysis.**

While Willey stipulated that he committed certain rule violations, "[a]n attorney's stipulation as to a violation is not binding on us." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 117 (Iowa 2015) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kelsen*, 855 N.W.2d 175, 181 (Iowa 2014)). Even if an attorney's stipulation concedes

a rule violation, we will only find that a violation occurred if the facts are sufficient to support the stipulated violation. *Id.* Thus, we address each alleged rule violation in turn to determine whether the Board met its burden of proof. *Id.*

**A. Rule 32:1.7(a)(2) Violation (Concurrent Conflict of Interest).**
Rule 32:1.7(a) provides that an attorney cannot represent a client if the representation of that client would involve a concurrent conflict of interest. Iowa R. Prof'l Conduct 32:1.7(a). There are two types of concurrent conflicts of interest under this rule. *Id.* Under subsection (a)(1), a conflict of interest exists if an attorney's representation of one client is "directly adverse to another client." *Id.* r. 32:1.7(a)(1). Under subsection (a)(2), a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." *Id.* r. 32:1.7(a)(2). The Board charged and the commission found a violation of rule 32:1.7(a)(2), the "materially limited" prong of the concurrent conflict of interest rule.

1. *Background of rule 32:1.7.* We utilize a two-step approach to determine whether an attorney has violated rule 32:1.7(a)(2). First, we must decide whether Willey's representation of one client was affected by his "responsibilities to another client, a former client, or a third person." *Id.*; *see also Stoller*, 879 N.W.2d at 207. If so, we next decide whether Willey's representation of one client was materially limited by his representation of another. Iowa R. Prof'l Conduct 32:1.7(a)(2); *see also Stoller*, 879 N.W.2d at 208.

The comments to the rule expand on the meaning of material limitation:

> Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.

Iowa R. Prof'l Conduct 32:1.7 cmt. 8. The key questions a lawyer must ask are whether it is likely a difference in interests will occur between the clients and, if so, whether that difference in interests will interfere with the lawyer's ability to offer independent, professional judgment to each client. *Id.*

A material limitation is also defined in the Restatement (Third) of the Law Governing Lawyers. *See* Restatement (Third) of the Law Governing Lawyers § 121 cmt. c(*ii*), at 248 (2000). A "materially adverse effect" is defined "by reference to obligations necessarily assumed by the lawyer." *Id.* These general obligations include the duty to "proceed in a manner reasonably calculated to advance a client's lawful objectives," the duty of competence, the duty of diligence, the duty to keep confidences, the duty to avoid conflicting interests among clients, the duty to deal honestly, the duty to not act in a manner adverse to a client's interests, and the duty to fulfill all obligations to the client. *Id.* § 16, at 146. Likewise, our own rules require that a lawyer fulfill certain duties to clients: competence, diligence, and communication. Iowa Rs. Prof'l Conduct 32:1.1, 1.3, 1.4. In determining whether an attorney's representation was materially limited, we ask whether the attorney was able to fully perform all of these duties to each of his or her clients. *See, e.g., Stoller*, 879 N.W.2d at 209.

The comments to rule 32:1.7 also provide examples of material conflicts, one of which discusses joint ventures:

> For example, a lawyer asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all

> possible positions that each might take because of the lawyer's duty of loyalty to the others.

Iowa R. Prof'l Conduct 32:1.7 cmt. 8. When two clients enter into a joint venture, their positions are at odds from the outset, which prevents an attorney from adequately advising each party of all the available alternatives. *See, e.g., Stoller*, 879 N.W.2d at 209. Similarly, we have recognized that the positions of a landlord and tenant or a buyer and seller are at odds with each other in a transaction. *See, e.g., id.*

2. *Disciplinary case examples.* In *Iowa Supreme Court Attorney Disciplinary Board v. Marks*, we found an attorney violated our rules regarding conflicts of interest. 814 N.W.2d 532, 539 (Iowa 2012). The attorney had previously represented a client in a foreclosure action and thereafter represented his own wife when she sold a piece of property to the former client. *Id.* at 540. Marks failed to obtain informed consent, confirmed in writing from his former client. *Id.* at 541. We noted that the situation was analogous to those situations where an attorney enters into a business transaction with a current client. *Id.* Because there was no harm to the client, we concluded that a public reprimand was appropriate. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Qualley*, we found two attorneys violated rules 32:1.7 and 32:1.8. 828 N.W.2d 282, 289 (Iowa 2013). Attorneys Qualley and Bleyhl represented Broadmoor Place Homeowners Association in collecting delinquent dues from a homeowner. *Id.* at 285. They began by sending the proper notice to cure default to the homeowner as a prerequisite to a foreclosure action and later filed the foreclosure petition on behalf of Broadmoor. *Id.* While the foreclosure action was pending, the homeowner filed for bankruptcy. *Id.*

The attorneys continued to represent Broadmoor in the bankruptcy action. *Id.*

In the decree of foreclosure it obtained later, Broadmoor acknowledged a first mortgage existed on the property that was superior to their lien. *Id.* When the first mortgage holder initiated a foreclosure action, Qualley and Bleyhl continued to represent Broadmoor's interests. *Id.* A sheriff's sale was set, but the first mortgagor dismissed its foreclosure action one week before the sale. *Id.* at 286. Also before the sheriff's sale, Bleyhl had sent an email to Broadmoor's property manager informing her of the company's right to purchase the property at the sale, but advising her against exercising that right. *Id.* The email also stated that Bleyhl and Qualley had found a potential buyer, but there was a potential conflict of interest because they would also be representing the buyer. *Id.*

Qualley and Bleyhl had a friend, Izaah Knox, with whom they had discussed entering into a business to "flip" real estate. *Id.* Qualley and Bleyhl approached Knox about buying the property at the sheriff's sale because they believed they could flip it quickly and make a profit. *Id.* Knox agreed, and Qualley and Bleyhl organized a company named Elite Real Estate, L.L.C. *Id.* Knox provided the initial capital to Elite, and neither Qualley nor Bleyhl provided any financial contribution. *Id.*

After the first mortgagor on the property dismissed its foreclosure action, Qualley and Bleyhl failed to inform their client, Broadmoor. *Id.* While there was a factual dispute regarding whether Broadmoor was advised of Qualley and Bleyhl's relationship with Elite, nothing was confirmed in writing nor was Broadmoor advised to seek independent legal advice based on this new development. *Id.* at 287. At the sheriff's sale, Qualley provided a written bid of $6500 on behalf of Broadmoor,

and then either Qualley or Bleyhl made an oral bid of $6900 on behalf of Elite. *Id.* Elite was issued the sheriff's deed to the property that day. *Id.* We found that Qualley and Bleyhl violated rules 32:1.7 and 32:1.8. *Id.* at 289. We suspended their licenses to practice law for a period of sixty days. *Id.* at 294.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Wagner*, an attorney entered into an agreement with Carl Oehl that he would assist in finding a buyer for his restaurant and represent Oehl in the sale in exchange for a commission of ten percent of the gross sale price of Oehl's business. 599 N.W.2d 721, 723 (Iowa 1999). Shortly after this agreement, one of Wagner's former clients, David Childers, consulted with Wagner about buying Oehl's restaurant and starting his own business. *Id.* at 724. Wagner orally informed Childers that he represented Oehl in the sale of the restaurant and that Childers should seek independent counsel. *Id.* He did not inform Childers that he would receive a commission or why he was recommending Childers seek the advice of independent counsel. *Id.* We held that Wagner violated a provision of our old rules that prevented an attorney from entering into a business transaction with a client without disclosing the lawyer's own self-interest. *Id.* at 727. We suspended his license for three months. *Id.* at 729.

In *Iowa Supreme Court Attorney Disciplinary Board v. Wright*, an attorney utilized funds from five clients to assist another client in attempting to obtain what he believed was an inheritance from a cousin in Nigeria. 840 N.W.2d 295, 297–98 (Iowa 2013). One of Wright's clients, Madison, approached Wright to see if he would represent him in a transaction to obtain a large inheritance from a cousin in Nigeria. *Id.* at 297. He informed Wright that he needed to pay $177,660 in taxes and

then a sum of $18,800,000 would be released to him. *Id.* Wright approached five other clients to ask if they would consider loaning Madison funds for the purpose of paying taxes and fees on the purported Nigerian inheritance. *Id.* at 297–98. One client loaned Madison $12,000, payable to Wright, and Madison signed a document promising to repay the client $50,000 "upon receipt of [the] inheritance funds." *Id.* at 297. Another loaned Madison $25,000 in exchange for a promise from Madison to pay her $100,000 upon his receipt of the inheritance from Nigeria. *Id.* at 297–98. Three additional clients loaned Madison sums in the amount of $7000, $20,000, and $160,000. *Id.* at 298. None of the loans made to Madison were ever repaid. *Id.* at 299. We found Wright violated rules 32:1.1 (competence), 32:1.8(a) (business transaction with current client), and 32:8.4(c) (professional misconduct involving dishonesty, fraud, deceit, or misrepresentation). *Id.* at 299–302. Because of the severity of the harm to Wright's clients and his prior history of discipline, we imposed a twelve month suspension. *Id.* at 303.

3. *Willey's conduct.* In the transaction between Wieniewitz and Synergy, Willey represented two parties on opposing sides of a transaction. The interests of Wieniewitz as the party loaning the money, and Synergy as the party receiving the loan, were at odds from the beginning. That the two parties had competing interests is demonstrated throughout the transaction. Throughout the email correspondence, Willey was repeatedly caught between the interests of Wieniewitz and the interests of Wild. During the entire transaction, Willey continued to represent the interests of Wild and Synergy, charging and collecting tens of thousands of dollars in legal fees. At the same time, Willey was unable to adequately pursue the interests of Wieniewitz in obtaining the return of his original investment, let alone any of the future payments promised

to him in the promissory note prepared by Willey on behalf of Synergy/Wild. Other than forwarding information from one client to another, Willey did nothing to advance the legal interests of Wieniewitz.

After Wieniewitz obtained new counsel, Willey expressed that he could not give certain information to Wieniewitz because of nondisclosure agreements and because dispersing the information could harm Wild. Clearly, Synergy was not in a position to return Wieniewitz's money, and Willey was not able to adequately pursue Wieniewitz's interest in obtaining a full refund of the money he provided under the promissory note. We agree with the finding of the commission and hold that the Board proved a violation of rule 32:1.7(a)(2) by a convincing preponderance of the evidence.

**B. Rule 32:1.7(b)(4) Violation (Informed Consent).** If there is a concurrent conflict of interest, our rules provide a mechanism for the attorney to cure the conflict and continue to represent both clients. Iowa R. Prof'l Conduct 32:1.7(b); *see also Stoller*, 879 N.W.2d at 210. If a concurrent conflict of interest exists, one of the steps an attorney must take to cure the conflict is to obtain "informed consent, confirmed in writing" from both clients. Iowa R. Prof'l Conduct 32:1.17(b)(4). When the conflict exists at the outset of representation, the attorney must obtain the written consent before undertaking the representation. *Id.* r. 32:1.7 cmt. 3.

Contrary to the position taken by Willey, he never informed Wieniewitz of the concurrent conflict of interest, and certainly not the extent of his relationship with Wild or his involvement with Synergy. Willey failed to obtain any informed consent, confirmed in writing, from Wieniewitz before continuing to represent both parties in the loan transaction. We agree with the finding of the commission and hold that

the Board proved a violation of rule 32:1.7(b)(4) by a convincing preponderance of the evidence.

**C. Rule 32:1.8(b) Violation (Using Client Information).** Rule 32:1.8(b) provides that "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent." *Id.* r. 32:1.8(b). Because it will not affect the sanction we impose, we decline to decide whether a violation of rule 32:1.8(b) occurred under this set of circumstances. *See, e.g.*, *Wright*, 840 N.W.2d at 302.

**D. Rule 32:1.9(c) Violation (Duties to Former Clients).** Rule 32:1.9(c) provides,

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

Iowa R. Prof'l Conduct 32:1.9(c).

The commission found there was not a sufficient factual basis to find a violation of rule 32:1.9(c). Willey continued to represent Synergy and to bill Wild for legal services during this entire transaction and through 2015. We agree that there was not a sufficient factual basis to determine that either client was a *former*, rather than current, client of Willey's at the time of the transaction and hold that the Board did not prove a violation of rule 32:1.9(c) by a convincing preponderance of the evidence.

**E. Sanction.** Although we consider our prior cases instructive when we determine a proper sanction, "[t]here is no standard sanction for [any] particular type of misconduct." *Stoller*, 879 N.W.2d at 218 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 591 (Iowa 2015)). We determine the appropriate sanction for a violation of our rules based on the particular circumstances of each case. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morris*, 847 N.W.2d 428, 435 (Iowa 2014).

> When crafting a sanction, we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Stoller*, 879 N.W.2d at 219 (quoting *Blessum*, 861 N.W.2d at 591).

1. *Range of sanctions.* We find that Willey violated rules 32:1.7(a)(2) (concurrent conflict of interest) and 32:1.7(b)(4) (informed consent). Each of the rule violations fall under the general category of a conflict of interest. In the cases discussed above, we found a range of sanctions for attorney misconduct arising out of conflicts of interest. In *Marks*, we concluded a public reprimand was the appropriate sanction when there was no harm found to the client. 814 N.W.2d at 541–42. In *Qualley*, we suspended the attorneys' licenses for sixty days for violations of rules 32:1.7 and 32:1.8. 828 N.W.2d at 289, 294. In *Wagner*, we suspended an attorney's license for three months for entering into a business transaction with a client and not disclosing his own interest in the transaction. 599 N.W.2d at 727, 730. In *Wright*, we suspended an attorney's license for twelve months after he convinced five clients to loan another client money for a loan scam. 840 N.W.2d at 299, 303.

2. *Mitigating and aggravating factors.* We must also consider any existing mitigating or aggravating factors. *Stoller*, 879 N.W.2d at 220–21. There are a number of both mitigating and aggravating factors present in this case.

Willey was cooperative with the Board's investigation, which we consider a mitigating factor. *Qualley*, 828 N.W.2d at 294. In Willey's personal statement, he expressed regret for his actions and the harm it caused to his clients. In the joint stipulation, Willey admitted to the ethical violations. We consider both remorse and the admission of wrongdoing to be mitigating factors. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 215 (Iowa 2016) (considering remorse a mitigating factor); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 795 N.W.2d 502, 506 (Iowa 2011) (considering admission of wrongdoing a mitigating factor). We also note that Willey has not been the subject of prior disciplinary action, which we consider a mitigating factor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 339 (Iowa 2015). Finally, Willey has engaged in extensive community service, which we also consider a mitigating factor. *Stoller*, 879 N.W.2d at 221.

However, we must also consider the aggravating circumstances surrounding this transaction. We consider harm to a client an aggravating factor. *Weiland*, 885 N.W.2d at 215. The $100,000 financial harm to Wieniewitz was significant. To this day, the Wieniewitzes have not received any money for their investment. The record also does not reflect that Wieniewitz is a sophisticated or wealthy business person who was in a position to lose his and his wife's money. Prior to investing, Wieniewitz told Willey that he could only be out the money for no longer than the forty-five days reflected in the promissory note. Willey assured him the investment was safe. More significantly, the very structure of

the investment was questionable from the beginning with an outrageous promise of a return on the investment. Within weeks, Wieniewitz's wife was already questioning whether the transaction was a sham. No one could reasonably counsel a client that this was a sound investment opportunity. Willey was also an experienced attorney and CPA who had been practicing for many years. We consider the experience of an attorney to be an aggravating factor. *Bartley*, 860 N.W.2d at 339. In this same vein, it is clear that Willey was able to recognize a conflict of interest and knew what his ethical obligations were to his client, as he had Wild execute a consent and waiver of any conflicts of interest three years before.

We also note that "persistence . . . in perpetuating [a] falsehood is a remarkable aggravating factor." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 885 N.W.2d 408, 424 (Iowa 2016) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 466 (Iowa 2014)). While failing to disclose the conflict of interest to Wieniewitz, Willey repeatedly represented to Wieniewitz that his payment was forthcoming "soon," whether in a few days or the next week. Willey continued to tell Wieniewitz the payment would be coming "just next week" for nearly two years. It was only much later that Wieniewitz learned of the conflict of interest, and then Willey advised him to seek other legal counsel. In our de novo review of the record, and considering all of the mitigating and aggravating circumstances in this case, we find that the aggravating factors weigh in favor of a longer period of suspension. We conclude a sixty-day suspension is appropriate.

**IV. Conclusion.**

For the above reasons, we suspend Willey's license to practice law with no possibility of reinstatement for sixty days from the filing of this

opinion. The suspension shall apply to all facets of the practice of law. Iowa Ct. R. 34.23(3). Willey must comply with the notification requirements of our rules. *Id.* r. 34.24. Costs are assessed to Willey. *Id.* r. 36.24(1). Unless the Board objects, Willey shall be automatically reinstated after the sixty-day suspension period on the condition all costs have been paid. *Id.* r. 34.23(2).

**LICENSE SUSPENDED.**